**DUNCAN ENERGY COMPANY, a Colorado General Partnership; Meridian Oil, Inc., a Delaware Corporation, Appellees,**

v.

**UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture; Samuel P. Redfren, in his official capacity as District Ranger for the Medora Ranger District, North Dakota, Appellants.**

No. 93–4005.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 13, 1994.

Decided March 21, 1995.

John T. Stahr, Washington, DC, argued (Robert L. Klarquist, Michael W. Reed, James B. Snow, Jeffrey D. Eisenberg, Christine Everett and Alan J. Campbell, on the brief), for appellants.

Charles L. Kaiser, Denver, CO, argued (Anthony J. Shaheen, John Morrison and Brian R. Bjella, on the brief), for appellees.

Before WOLLMAN, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and HANSEN, Circuit Judge.

JOHN R. GIBSON, Senior Circuit Judge.

The United States Forest Service and its district ranger for the Medora Ranger District, North Dakota, appeal from the district court's entry of summary judgment granting declaratory relief to Meridian Oil, Inc. and Duncan Energy Company, an owner and developer of mineral rights. The district court allowed Duncan to proceed with mineral exploration on land in a national forest without Forest Service approval of the surface use plan. We reverse.

Meridian owns mineral rights on land within the Little Missouri National Grasslands area, which is part of the Custer National Forest in North Dakota. The United States owns the surface estate.[1] Duncan has an exploration agreement with Meridian.

---

1. The United States originally patented the land in question to Northern Pacific Railroad Company as a part of a railroad land grant. In 1916, the railroad deeded the land to various farmers, reserving "all minerals of any nature whatsoever ... together with the use of such of the surface

Since 1984, Meridian and its predecessor, Milestone Petroleum, have explored for oil and gas within the Custer National Forest without incident. Meridian submitted surface use plans to the Forest Service for review and obtained special use letters of authorization before developing its mineral estates. The Forest Service Regional Office reviews surface use plans by applying the standards and guidelines set forth in the Custer National Forest Land and Resource Management Plan. The Forest Service surveys resources in the area of proposed operations, analyzes potential effects, and determines whether there may be reasonable alternatives and mitigation measures. Following this review, the Forest Service issues a letter of authorization which establishes conditions and protective measures for surface use.

In 1984, the United States Forest Service and Meridian's predecessor, Milestone Petroleum, entered into a Memorandum of Understanding, which provided that the Forest Service would process a surface use plan within ten working days of the receipt of the complete surface use plan. Since 1984, Meridian has submitted fifteen surface plans to the Forest Service before drilling; the Forest Service has processed only two of the plans in fewer than ten days.

On October 15, 1992, the Forest Service and Duncan met to discuss well location, access, and road specifications for Duncan's anticipated drilling. The Forest Service suggested a different access route from that proposed by Duncan, and the access road was staked as the Forest Service suggested. On October 22, the Forest Service and several of Duncan's contractors met for an on-site surface inspection of the well location and staked access route. On December 7, 1992, Duncan submitted a surface use plan for a well site. The Forest Service advised Duncan's contractor that the surface use plan contained an inaccurate map of the proposed access route based on the October 22 meeting, and Duncan submitted a corrected map on December 24, 1992. The Forest Service then conducted an environmental analysis of the well and access route, consisting of a review of reports submitted by Duncan's contractors and consultation with the United States Fish and Wildlife Service and the North Dakota Department of Fish and Game. The Forest Service began to prepare an analysis document, which sets forth terms and conditions for the use of the federal surface.

Over the next two months, Duncan contacted the Forest Service to check the status of the Forest Service's authorization. Duncan wanted to begin drilling, as its contract with Meridian required it to drill seven wells within one year or incur liquidated damages. During this time, Duncan learned that the Forest Service believed that the Memorandum of Understanding did not apply and that the Forest Service was considering whether the more extensive National Environmental Policy Act procedures applied. Under NEPA, Duncan could not drill until the Forest Service completed an area-wide environmental impact study and a site-specific environmental impact statement, which might take two to three years. *See* 42 U.S.C. § 4332(2)(C) (1988).[2]

On March 4, 1993, Duncan sent a letter to the Forest Service stating that it had an absolute right to access and drill the site. Duncan requested that the Forest Service immediately issue a special use permit and comply with the 1984 Memorandum of Understanding. Duncan threatened to access the well as originally proposed if the Forest Service did not immediately approve the staked route. On March 16, 1993, Duncan submitted a revised map for the access route to the Forest Service. Because the new

as may be necessary for exploring for and mining or otherwise extracting and carrying away the same." In 1937, the United States acquired the surface estate pursuant to the Bankhead–Jones Farm Tenant Act, subject to the mineral reservation in the 1916 deed. Meridian eventually acquired the mineral rights and Meridian executed an oil and gas exploration agreement with Duncan on September 30, 1992.

2. NEPA provides that when a federal agency undertakes "major Federal action[ ] significantly affecting the quality of the human environment," it must prepare an environmental impact statement concerning that action. 42 U.S.C. § 4332(2)(C).

route varied two-tenths of a mile from the staked route, the Forest Service informed Duncan that it must complete the necessary environmental surveys for the new road, but that it would complete its analysis of the original route by the following week.

On Friday, March 19, 1993, at 4 o'clock p.m. Duncan telephoned the Forest Service to say that it would begin constructing the new road the next morning. The Forest Service visited the site the next morning and found that Duncan had begun constructing the road. Duncan completed all road construction by March 27. On April 6, 1993, Duncan placed the drill rig on the site, over the Forest Service's written objection. After Duncan asserted that the Forest Service was bound by the ten-day period stated in the Memorandum of Understanding, the Forest Service formally terminated the Memorandum on April 15, 1993.

Meanwhile, on March 29, 1993, Duncan filed suit against the Forest Service seeking a declaratory judgment that the Service could not prohibit access to or regulate the exploration and development of the privately owned oil and gas estate. The Forest Service filed an answer and a counterclaim asserting that Duncan had improperly used federal surface without obtaining the necessary authorization. The Forest Service requested a permanent injunction barring Duncan from further ground disturbing activity at the well site and on other National Forest System lands without the Forest Service's express written authorization.

After first determining that a justiciable controversy existed because the Forest Service sought a permanent injunction prohibiting Duncan from further work, the district court granted summary judgment to Duncan and Meridian. *Duncan Energy Co. v. United States Forest Service*, No. A1–93–033, slip op. at 3, 6, 1993 WL 664644 (D.N.D. Sept. 30, 1993). The district court reasoned that the mineral estate is the dominant estate and that the surface estate was therefore subser-

vient to the development, mining, and extraction of the minerals. *Id.* at 3. The court held that when the United States owns only the surface estate, it does not have the authority to regulate mineral estate exploration, development, mining or extraction different from or greater than state law. *Id.* at 6. The court stated that the surface owner "cannot prevent the exploration, mining or extraction of the underlying minerals even if that development will completely destroy the value of the surface estate or render it unsuitable for public usage." *Id.* at 3. The court determined that if the mineral estate holder causes damage to the surface estate, the mineral estate holder is liable in damages to the surface owner, and, if this remedy is "illusory," then the damage can only be righted by condemnation and purchase of the mineral estate. *Id.* at 3–4. After considering North Dakota law, the court concluded that an attempt to prohibit the development of mineral interests would constitute an inverse condemnation of the mineral estate. *Id.* at 4. The court rejected the Forest Service's argument that the Forest Service, as owner of the surface estate, had the power to adopt rules, regulations and permit requirements before allowing ground disturbing activity. *Id.* at 4–5.

### I.

The Forest Service appeals, arguing that the district court's decision is incorrect because the Forest Service has authority under North Dakota law and federal law to regulate federally-owned surface lands. The Forest Service acknowledges that the mineral estate is dominant, but points out that it is not seeking to deny access to the underlying non-federal lands, but only to protect federal lands during their use by the mineral holder.

Duncan responds that the district court's decision is consistent with the recognized difference between outstanding mineral rights and reserved mineral rights.[3] Duncan states that this case involves outstanding

---

3. Reserved rights are mineral rights reserved by the grantor when the federal government acquired its interest in land and are made expressly subject to Forest Service regulations codified at 36 C.F.R. § 251.15 (1994). Outstanding rights are mineral rights owned by third parties that were severed before the government acquired its surface rights, which the government took subject to those outstanding mineral rights.

mineral rights, and, consistent with long-standing law and Forest Service practice, outstanding mineral rights are not subject to the Forest Service's special use permit regulations. Duncan explains that the Forest Service and outstanding mineral rights owners have long conducted mineral activities under the "Negotiation/State Law Paradigm," under which the Forest Service negotiates with outstanding mineral rights holders and utilizes state law to regulate the surface use of federal lands, not the "Full Regulatory Paradigm," found in the special use permit regulations. We do not find these semantic pigeon holes to accurately reflect the complexity of the issues before us. Duncan argues that the Forest Service cannot deviate from established agency precedent and now require compliance with the special use permit regulations.

■ In ruling that Duncan may "interfere with or even destroy" the surface estate, slip op. at 6, the district court erred in its reading of North Dakota law. *See Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991) (court of appeals should review de novo, without deference, a district court's determination of state law).

Under North Dakota law, the mineral estate is dominant, carrying "inherent surface rights to find and develop the minerals." *Hunt Oil Co. v. Kerbaugh,* 283 N.W.2d 131, 135 (N.D.1979). The mineral developer's rights, however, are not unrestricted. The mineral developer's rights "are limited to so much of the surface and such use thereof as are *reasonably necessary* to explore, develop, and transport the minerals." *Id.* Thus, North Dakota law does not preclude the Forest Service from requiring that only reasonable use be made of the federal surface lands. *Hunt Oil* established that the mineral developer's right of access is subject to a standard of reasonableness:

> [I]f the manner of use selected by the dominant mineral lessee is the only reasonable, usual and customary method that is

available for developing and producing the minerals on the particular land then the owner of the servient estate must yield. However, if there are other usual, customary and reasonable methods practiced in the industry on similar lands put to similar uses which would not interfere with the existing uses being made by the servient surface owner, it could be unreasonable for the lessee to employ an interfering method or manner of use.

*Id.* at 136–37 (quoting *Getty Oil Co. v. Jones,* 470 S.W.2d 618, 627–28 (Tex.1971)).

■ Although North Dakota law protects the surface owner's property rights by limiting the mineral holder to the "reasonable use" of the surface, North Dakota law does not, and could not, cloak the Forest Service with the specific authority to approve surface use plans. Indeed, there is not even specific authority to allow a surface owner to enjoin the unreasonable use of the surface.[4] *Hunt Oil* does not discuss injunctive relief. North Dakota's Oil and Gas Production Compensation Act requires only that the mineral developer "give the surface owner written notice of the drilling operations contemplated at least twenty days prior to the commencement of the operations," and provides a damages remedy. N.D.Cent.Code § 38–11.1–05 (1987).

■ Nevertheless, the Forest Service contends that federal law gives it the authority to approve surface use plans. Duncan responds that Congress has not enacted and the Forest Service has not implemented by regulations the authority the Forest Service now attempts to invoke. In Duncan's words, "[t]his dispute turns on what the law is, not what the law could be." Duncan points out that Congress has not given the Forest Service the authority to regulate outstanding mineral rights, as it has given the National Park Service. *See* 16 U.S.C. § 1902 (1988); 36 C.F.R. § 9.30(a) (1994).

■ Congress has the power under the property clause to regulate federal land.

---

4. The statute provides: "If a mineral developer fails to give notice as provided under this section, the surface owner may seek any appropriate relief in the court of proper jurisdiction and may receive punitive as well as actual damages." N.D.Cent.Code § 38–11.1–05 (1987). The Forest Service does not argue that "any appropriate relief" includes the authority for injunctive relief.

U.S. Const. art. IV, § 3, cl. 2; *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580, 107 S.Ct. 1419, 1424–25, 94 L.Ed.2d 577 (1987). Indeed, Congress may regulate conduct occurring on or off federal land which affects federal land. *See, e.g., Kleppe v. New Mexico*, 426 U.S. 529, 539, 96 S.Ct. 2285, 2291–92, 49 L.Ed.2d 34 (1976); *Minnesota v. Block*, 660 F.2d 1240, 1249 (8th Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1645, 71 L.Ed.2d 876 (1982). Under the Bankhead–Jones Farm Tenant Act, Congress directed the Secretary of Agriculture "to develop a program of land conservation and land utilization." 7 U.S.C. § 1010 (1988). The Act directs the Secretary to make rules as necessary to "regulate the use and occupancy" of acquired lands and "to conserve and utilize" such lands. 7 U.S.C. § 1011(f) (Supp.V.1993). The Forest Service, acting under the Secretary's direction, manages the surface lands here as part of the National Grasslands, which are part of the National Forest System. *See* 16 U.S.C. § 1609(a) (1988). Congress has given the Forest Service broad power to regulate Forest System land. *See, e.g.,* 7 U.S.C. § 1011 (1988 & Supp.V.1993); 16 U.S.C. § 551 (Supp.V. 1993).

The Forest Service finds its authority to regulate surface access to outstanding mineral rights in the "special use" regulations. The special use regulations provide that "[a]ll uses of National Forest System land … are designated 'special uses' and must be approved by an authorized officer." 36 C.F.R. § 251.50(a).

Duncan discounts the all inclusive language of 36 C.F.R. § 251.50 by pointing out that reserved mineral rights are governed by their own specific regulations at 36 C.F.R. § 251.15, and that it is illogical that the Forest Service would address outstanding mineral rights in the more general special use regulations. Duncan interprets the "all uses" language of section 251.50 to mean only the uses specified in section 251.53. Duncan also cites to several provisions of the special

use regulations which it argues except outstanding mineral rights from the special use regulations.

■ Contrary to the district court's view, the special use regulations do not give the Forest Service "veto authority" over mineral development. Slip op. at 5. The Forest Service concedes that it cannot deny access to or prohibit mineral development, and only asks for the authority to determine the reasonable use of the federal surface.

Duncan's arguments that the special use regulations do not authorize the regulation of outstanding mineral rights are too broad. The only issue before us is the Forest Service's ability to regulate surface access to outstanding mineral rights. The Forest Service recognizes that it cannot prevent Duncan, as the owner of the dominant mineral estate, from exploring for or developing its minerals. Duncan draws far too much meaning from certain provisions of the regulations. For example, 36 C.F.R. § 251.55(c) [5] defines the type of interest acquired by the special use permit holder, and does not limit the application of the regulations. Likewise, 36 C.F.R. § 251, Subpart D, does not exempt outstanding mineral rights from the special use regulations, but addresses access to non-federal lands. The Forest Service argues that it is not prohibiting access to non-federal lands or diminishing Duncan's rights, but only regulating the use of the federal surface. For this same reason, Duncan's citation to 36 C.F.R. § 213.3(b) [6] is misplaced. The Forest Service is not challenging Duncan's "[e]xisting valid right[ ]" to conduct drilling operations.

Duncan also relies on the Forest Service Manual, the Custer National Forest Management Plan, various Forest Service rulings, agency statements, and congressional testimony as proof that the Forest Service has no regulatory authority and cannot deviate from established agency precedent and require

---

**5.** 36 C.F.R. § 251.55(c) (1994) provides: "Special use authorizations are subject to all outstanding valid rights."

**6.** 36 C.F.R. § 213.3(b) (1994) provides: "Existing valid rights … affecting [lands acquired under the Bankhead–Jones Act] shall continue in full force and effect so long as they remain valid in accordance with the terms thereof."

compliance with the special use permit regulations.

Duncan states that the Forest Service Manual unambiguously adopts the negotiation and state law approach, citing several provisions. Duncan stresses that the Forest Service Manual "explains to the public" and the Forest Service itself the framework for the management of Forest Service programs, *see Meadow Green–Wildcat Corp. v. Hathaway,* 936 F.2d 601, 605 (1st Cir.1991), and that the Forest Service must follow its own manual as a matter of law. *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974). Duncan points out that the manual does not cite the special use regulations and draws our attention to several provisions of the manual.

Duncan's citation to the sentence in the Manual stating that the Secretary's rules and regulations do not apply to outstanding mineral rights is taken out of context. The sentence simply states and means only that the regulations governing reserved mineral rights in 36 C.F.R. § 251.15 do not cover outstanding mineral rights. The Manual goes on to state that "the exercise of all reserved and outstanding mineral rights is subject to applicable Federal and State laws and regulations pertaining to mining, real property, and environmental protection." Although the Forest Service Manual does not cite the special use regulations, the substance of the manual is consistent with the regulations. For example, the Manual requires the mineral estate owner to submit "an operating plan for the exercise of outstanding mineral rights," including methods for controlling environmental degradation. The Manual authorizes the Forest Service to send a letter of authorization after reviewing the plan to determine whether it "[u]ses only so much of the surface as is prudently necessary for the proposed operations." Although the Manual says that the Forest Service should meet with the mineral owner to negotiate modifications, it provides for "appropriate legal action" if the mineral owner deviates from the operating plan.

Duncan also makes arguments based upon an Administrative Analysis and Finding issued by the Forest Supervisor for the White River National Forest for the Conundrum Marble Quarry Proposal and to litigation and congressional testimony surrounding the exercise of outstanding mineral rights in the Allegheny National Forest. *See United States v. Minard Run Oil Co.,* Civil No. 80–129 (W.D.Pa. Dec. 16, 1980).[7] Duncan argues that the Forest Service's position taken in those two national forests establishes that the Forest Service negotiates with owners of outstanding mineral rights, and that the Forest Service lacks authority to regulate the exercise of such rights unilaterally. We need not develop these arguments in greater detail, as they are simply unconvincing.

■ The Forest Service's position in this case does not violate the Custer National Forest Management Plan and is reconcilable with the Forest Service position in the *Minard Run* case and the Allegheny National Forest hearings. The statement in the Custer National Forest Management Plan that the Forest Service will "through negotiation, develop a memorandum of understanding with large holders of mineral rights," does not mean that the Forest Service is implicitly limited to negotiating with mineral rights holders instead of regulating their use of surface. Although in the *Minard Run* case the government acknowledged that it was not acting as a sovereign, the court ordered that the oil company provide reasonable advance notice of a map of the well sites, road, and pipeline, as well as a plan of operations, and a plan of erosion and sedimentation control. In addition, there are other statements contained in the Allegheny Forest hearings which are consistent with the Forest Service position here, that is, regulating outstanding mineral rights holders use of federal surface while honoring the holder's absolute right to mineral development. Oil and Gas Operations in the Allegheny National Forest, Northwestern Pennsylvania: Oversight Hearing before the Subcommittee on Energy and Environment of the House Committee

---

7. Although the Rules of our court generally prohibit citation to unpublished opinions, Eighth Cir.R. 28A(k), we acknowledge that Duncan is not citing *Minard Run* as legal authority, but rather as an example of Forest Service action in other cases.

on Interior and Insular Affairs, 102nd Cong. 1st Sess. 75–76 (1991). In any event, the Forest Service's position in other cases cannot be considered as binding authority that the special use regulations do not apply. "[W]hen an agency deviates from established precedent, it must provide a reasoned explanation for its failure to follow its own precedents," but "[t]his requirement does not mean that an agency may not change its policies." *Baltimore Gas & Elec. Co. v. Heintz,* 760 F.2d 1408, 1418 (4th Cir.), *cert. denied,* 474 U.S. 847, 106 S.Ct. 141, 88 L.Ed.2d 116 (1985). The Forest Service's position is entitled to deference. " '[R]egulatory agencies do not establish rules of conduct to last forever,' and ... an agency must be given ample latitude to 'adapt their rules and policies to the demands of changing circumstances.' " *Motor Vehicle Mfr's Ass'n of the United States, Inc. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (citations omitted); *see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 863, 104 S.Ct. 2778, 2792, 81 L.Ed.2d 694 (1984) ("The fact that the agency has from time to time changed its interpretation ... does not ... lead us to conclude that no deference should be accorded the agency's interpretation of the statute."). For these reasons, we are convinced that the Forest Service has the limited authority it seeks here; that is, the authority to determine the reasonable use of the federal surface.[8]

## II.

If North Dakota law is read to allow developers unrestricted access after twenty days' notice and no injunctive relief for the surface owner, North Dakota law is inconsistent with the special use regulations. State law may be pre-empted in two ways:

---

If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted. If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishments of the full purposes and objectives of Congress.

*Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (citations omitted); *ANR Pipeline Co. v. Iowa State Commerce Comm'n,* 828 F.2d 465, 468 (8th Cir.1987).

In addition, under choice-of-law principles, when determining whether to apply federal or state law, federal courts will apply federal law "when the case arises from or bears heavily upon a federal regulatory program." *United States v. Albrecht,* 496 F.2d 906, 910 (8th Cir.1974) (citing *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 592, 93 S.Ct. 2389, 2396–97, 37 L.Ed.2d 187 (1973)).

Allowing unrestricted access after twenty days' notice would impede Congress' objective of protecting federal lands and abrogate a congressionally-declared program of national scope. If North Dakota law is read to allow a developer unrestricted access after twenty days' notice, North Dakota law is pre-empted or falls under choice-of-law principles.

Accordingly, the judgment of the district court is reversed, and the case is remanded to the district court with instructions to enter summary judgment for the United States and an order declaring that Duncan violated Forest Service regulations by proceeding with mineral development absent Forest Ser-

---

8. Duncan explains that it resorted to proceeding without Forest Service authorization because of the Forest Service's delay in processing its surface use plan. Implicit in our conclusion that the Forest Service is authorized to determine the reasonable use of the federal surface is our assumption that the Forest Service's inquiry must be reasonable, and thus, expeditious. Otherwise, the Forest Service's authority could expand to "veto authority" over mineral development. The Forest Service concedes that it cannot prohibit

mineral development and recognizes the mineral holder's absolute right to develop its mineral estate. Counsel at oral argument represented that the Forest Service approval of a surface use plan usually takes about two months. We believe such a timeframe is consistent with the Forest Service's authority to determine the reasonable use of the federal surface and does not violate the mineral holder's dominant right to access and develop its mineral estate.

vice authorization of the surface use plan. The Forest Service's request for a permanent injunction is best considered by the district court on remand. We reverse and remand for further proceedings consistent with this opinion.