70 F.3d 881
 64 USLW 2359, 26 Envtl. L. Rep. 20,225
 Kathy STUPAK-THRALL, Michael A. Gajewski, and Bodil
Gajewski, Plaintiffs-Appellants,
v.
UNITED STATES of America and Daniel R. Glickman,
[1] Secretary of Agriculture,
individually and in his official
capacity, Defendants-Appellees.
 No. 94-1863.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 19, 1995.
Decided Nov. 29, 1995.
 
 Todd S. Welch (argued and briefed), William P. Pendley, Mountain States Legal Foundation, Denver, CO, for Kathy Stupak-Thrall.
 Todd S. Welch, Mark D. Tousignant, Iron River, MI, for Michael A. Gajewski, Bodil Gajewski.
 Peter A. Appel (argued and briefed), U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, Judd R. Spray, Office of U.S. Atty., Marquette, MI, for U.S.
 John A. Bryson, Peter A. Appel, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, Judd R. Spray, Office of U.S. Atty., Marquette, MI, for Michael Espy.
 Walter Kuhlman (briefed), Boardman, Suhr, Curry & Field, Madison, WI, amicus curiae for Upper Peninsula Environmental Coalition.
 Before: BROWN, NELSON, and MOORE, Circuit Judges.
 MOORE, Circuit Judge.
 
 
 1
 The extent and validity of federal power under the Wilderness Act of 1964 and the Michigan Wilderness Act of 1987 form the central issues of this appeal. Plaintiffs are possessors of surface rights to a lake, held in common with the United States. They challenge certain United States Forest Service restrictions on activities on the lake, claiming that they are beyond the Forest Service's statutory and constitutional authority. The district court upheld the restrictions, finding them to be within the power granted by the Property Clause of Article IV, Section 3, Clause 2, and finding that plaintiffs' property rights were subject to reasonable regulation under Michigan law. Because we conclude that the Property Clause gives Congress the power to regulate the lake, that Congress has delegated authority to the Forest Service to regulate the lake, and that regulation of the lake does not exceed the wilderness acts' express limitations deferring to state law property rights, we affirm.I
 
 
 2
 Plaintiffs own land on the northern shore of Crooked Lake, in Michigan's Upper Peninsula near the Wisconsin border. Because of their ownership, plaintiffs possess "riparian," or "littoral," rights under Michigan law--i.e., common property interests in Crooked Lake's surface.[2] Plaintiffs have the right to make reasonable use of the entire surface, which includes, at core, those uses "absolutely necessary for the existence of the riparian proprietor and his family, such as to quench thirst and for household purposes." Thompson v. Enz, 379 Mich. 667, 154 N.W.2d 473, 483 (1967). Additional, though less fundamental, riparian uses include "those which merely increase one's comfort and prosperity ... such as commercial profit and recreation." Id., 154 N.W.2d at 484. The United States is also a riparian owner. In fact, the vast majority of Crooked Lake's shoreline, about 95%, lies within the Sylvania Wilderness Area, a national wilderness administered by the Forest Service, and private riparian ownership such as plaintiffs' exists only along a tiny bay jutting out to the north of the wilderness. Nevertheless, the nature of riparian ownership is such that each owner shares rights to the whole lake, so long as his or her land touches the lake waters. Rice v. Naimish, 8 Mich.App. 698, 155 N.W.2d 370, 373 (1967).
 
 
 3
 At issue are certain management prescriptions of the Forest Service relating to the portion of Crooked Lake lying within the Sylvania Wilderness Area. Amendment No. 1, adopted by the Forest Service in 1992 to amend its national forest land and resource management plan governing the Sylvania Wilderness, prohibits, among other things, the use of "sail-powered watercraft," "watercraft designed for or used as floating living quarters," and "[n]onburnable disposable food and beverage containers" in the wilderness. (Admin.Rec.36, 38.) Land and resource management plans are prepared under the guidelines of 16 U.S.C. Sec. 1604 and 36 C.F.R. Sec. 219, which provide for notice and opportunity to comment on proposed plans and amendments, and Amendment No. 1 was properly adopted pursuant to this framework. Notably, Amendment No. 1 has no effect on the small bay outside the wilderness area on which plaintiffs' properties lie. But because plaintiffs have riparian rights in the whole surface of Crooked Lake, they claim that Amendment No. 1's restrictions on sailboats, houseboats, and food containers are an unauthorized infringement of their rights to unrestricted use of the entire lake. According to plaintiffs, both the Wilderness Act of 1964 ("Wilderness Act"), 16 U.S.C. Secs. 1131-1136, which established the National Wilderness Preservation System, and the Michigan Wilderness Act of 1987 ("MWA"), Pub.L. No. 100-184, 101 Stat. 1274, which specifically established the Sylvania Wilderness, expressly limit the power of the federal government to regulate in the face of private property rights. The Wilderness Act states:
 
 
 4
 Except as specifically provided for in this chapter, and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this chapter and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter ... there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.
 
 
 5
 16 U.S.C. Sec. 1133(c) (emphasis added). The MWA, incorporating the Wilderness Act by reference, states:
 
 
 6
 Subject to valid existing rights, each wilderness area designated by this Act shall be administered by the Secretary of Agriculture in accordance with the provisions of the Wilderness Act of 1964 governing areas designated by that Act as wilderness areas....
 
 
 7
 Pub.L. No. 100-184, Sec. 5, 101 Stat. 1274, 1275-76 (1987) (emphasis added). Because of this "subject to existing rights" language, plaintiffs argue that the Secretary of Agriculture (and hence the Forest Service) is sharply limited in regulating the Sylvania Wilderness insofar as such regulation affects plaintiffs' "existing" rights in Crooked Lake. Plaintiffs contend that, absent clear authorization by Congress, the Forest Service may only impose restrictions on property that is exclusively federal. They assert that property that is owned jointly by individuals and the government, such as the surface of Crooked Lake, must be deemed "non-federal" for purposes of Forest Service regulations. In plaintiffs' view, the Forest Service may not limit the ability of riparian owners to navigate Crooked Lake's surface in their watercraft of choice.
 
 
 8
 Plaintiff Kathy Stupak-Thrall initially challenged the promulgation of Amendment No. 1 with the Forest Service, in accordance with the appeal procedures of 36 C.F.R. Sec. 217. The Regional Forester denied Thrall's first-level appeal, finding that "valid existing rights" in the MWA referred only to mineral rights in a different Michigan wilderness.[3] The Regional Forester also noted that even if riparian rights were "valid existing rights," the Forest Service could still regulate them pursuant to the Wilderness Act and the Property Clause. The Chief of the Forest Service exercised discretionary review of the Regional Forester's decision, affirming it in all respects. Thrall then sought review in the U.S. District Court for the Western District of Michigan, appending a claim of taking without just compensation. At the same time, plaintiffs Michael Gajewski and Bodil Gajewski filed suit in the same court, also challenging Amendment No. 1 and raising a taking claim. Although the United States moved to dismiss the Gajewskis' action, based on their failure to exhaust administrative remedies, the district court consolidated the case with Thrall's. Both sides moved for summary judgment, there being no material facts at issue. The district court disagreed with the Forest Service's determination that riparian rights were not "valid existing rights" under the MWA,[4] but it nonetheless granted a partial summary judgment for the United States on the issue of the validity of Amendment No. 1. Stupak-Thrall v. United States, 843 F.Supp. 327 (W.D.Mich.1994). The court observed that the Property Clause and Wilderness Act gave broad authority to the Forest Service to regulate "nonfederal as well as federal property" in order to protect the latter. Id. at 331-32. In addition, the court held that the regulations were permissible under Michigan law under the "reasonable use" doctrine. Id. at 333-34. Plaintiffs moved to dismiss the remaining taking claim without prejudice, so that an immediate appeal might be taken of the summary judgment. The motion was granted, and plaintiffs timely filed a notice of appeal.
 
 II
 
 9
 We review a district court's award of summary judgment de novo. City Management Corp. v. U.S. Chemical Co., 43 F.3d 244, 250 (6th Cir.1994). In other words, we review the Forest Service's decision to adopt Amendment No. 1 under the same standards employed by the district court itself. As an initial matter, we are faced with the question of the Forest Service's constitutional authority to regulate Crooked Lake. The constitutionality of an agency's action is subject to plenary review. 5 U.S.C. Sec. 706(2)(B).
 
 
 10
 The Forest Service's authority is grounded in Congress's authority under the Property Clause, which declares that "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, Sec. 3, cl. 2. Contrary to plaintiffs' apparent assertions, Congress's inherent authority under this clause is not limited to regulation of purely federal property. In fact, since 1897, the Supreme Court has recognized that "needful" regulations "respecting" government property will sometimes include the exercise of power over purely private property, in order to ensure adequate protection of the federal interest. In Camfield v. United States, 167 U.S. 518, 17 S.Ct. 864, 42 L.Ed. 260 (1897), the Court held that Congress could prohibit fences on private property that were used to block access to federal lands. Similarly, in United States v. Alford, 274 U.S. 264, 266, 47 S.Ct. 597, 598, 71 L.Ed. 1040 (1927), the Court relied on Camfield to uphold congressional laws prohibiting the building of fires on or "near" any federal property and the failure to extinguish them. Although neither Camfield nor Alford refers explicitly to the Property Clause--in fact, they cite no constitutional provision whatsoever to support the authority of Congress--the basis for these decisions was later clarified by a unanimous Court in Kleppe v. New Mexico, 426 U.S. 529, 538, 96 S.Ct. 2285, 2290, 49 L.Ed.2d 34 (1976), which explained:
 
 
 11
 Camfield holds that the Property Clause is broad enough to permit federal regulation of fences built on private land adjoining public land when the regulation is for the protection of federal property. Camfield contains no suggestion of any limitation on Congress' power over conduct on its own property; its sole message is that the power granted by the Property Clause is broad enough to reach beyond territorial limits.
 
 
 12
 Kleppe itself held that Congress may regulate wild animals on public land under the Property Clause. In the actual controversy before the Court, wild burros had been seized directly on the federal land, but the statute at issue also provided for regulation of "protected horses or burros [which] 'stray from public lands onto privately owned land.' " Id. at 531-32, 96 S.Ct. at 2288.
 
 
 13
 The Eighth and Ninth Circuits have applied Camfield, Alford, and Kleppe in analogous circumstances to the instant case. In United States v. Lindsey, 595 F.2d 5 (9th Cir.1979), the court followed Alford and concluded that the federal government could regulate the building of forest fires on state-owned land if the regulation was for the purpose of protecting federal land. It noted that the Property Clause "grants to the United States power to regulate conduct on non-federal land when reasonably necessary to protect adjacent federal property or navigable waters." Id. at 6.
 
 
 14
 In two Minnesota cases, the Eighth Circuit held that the Property Clause would permit congressional regulation in factual situations very similar to our own. The court in United States v. Brown, 552 F.2d 817 (8th Cir.1977), cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977), relied on both Kleppe and Camfield to determine that Congress has the power to regulate state-owned waters enclosed within the boundaries of a national park. There was some question in Brown as to whether the state had ceded ownership (and jurisdiction) over the waters to the United States, but the court went on to say that even if the federal government did not have any ownership interest in the water, the Property Clause was broad enough to allow regulation of non-federal waters "in order to protect wildlife and visitors on the lands." Id. at 822. Likewise in Minnesota v. Block, 660 F.2d 1240 (8th Cir.1981), cert. denied, 455 U.S. 1007, 102 S.Ct. 1645, 71 L.Ed.2d 876 (1982), the court of appeals held that Congress could impose motorboat restrictions on state-owned waters in a wilderness area where 90% of the surrounding land was federal property and 10% was state-owned. Again, even though the federal government had no ownership interest in the water itself, the Property Clause allowed it to implement restrictions to protect the surrounding federal wilderness.
 
 
 15
 Block and Brown involved federal regulation of state-owned waters (or arguably state-owned waters in the case of Brown). The present action, however, involves shared ownership of the surface waters between the federal government and private citizens. If anything, the fact that the United States has a defined ownership interest in the water presents a stronger case for Congress's regulatory authority under the Property Clause. By contrast, the fact that the federal regulation covers private rather than state-owned property should make no difference at all, since Camfield and Alford make clear that Congress may restrict actions on private property if they affect the government interest in protecting federal property.
 
 
 16
 There can be little question that Congress has the power to regulate Crooked Lake in the manner described by Amendment No. 1's management prescriptions. The Property Clause gives Congress broad authority to decide what are "needful" regulations "respecting" federal property. Kleppe instructs: "[W]e must remain mindful that, while courts must eventually pass upon them, determinations under the Property Clause are entrusted primarily to the judgment of Congress." 426 U.S. at 536, 96 S.Ct. at 2290. In this case, the management prescriptions at issue are clearly tailored toward protecting federal property. The avowed purpose of the prohibition against sailboats, houseboats, and "nonburnable" food containers is "to protect and perpetuate wilderness character and values." Wilderness Management Amendment No. 1, IV 5.1-1. There is no doubt that the restrictions assist in protecting the wilderness character of the area. The Wilderness Act itself states that "wilderness" is defined as "an area where the earth and its community of life are untrammeled by man ... retaining its primeval character and influence, without permanent improvements or human habitation." 16 U.S.C. Sec. 1131(c). Certainly, Congress could rationally conclude that certain forms of mechanical transport, including sailboats and houseboats, should be excluded from the Sylvania Wilderness in order to preserve the "wilderness character" of the property.[5] The protection of wilderness character is a valid objective under the Property Clause to the same extent that Congress's objectives in enacting the Wild Free-Roaming Horses and Burros Act in Kleppe, "for achievement of an ecological balance on the public lands," were valid. 426 U.S. at 535, 96 S.Ct. at 2289. Just as Congress's authority may sometimes extend to purely private property in order to provide adequate protection of public property, so in this instance may federal regulations encompass shared property rights between the United States and private owners, at least to the extent that the regulations are designed to govern the portion of the water surface contained completely within the borders of government-owned land. This at a minimum is what the Property Clause allows--regulation to protect not only the government's own riparian interest in the lake, but also its interest in the surrounding national wilderness.
 
 III
 
 17
 Once we determine that Congress has the authority to prohibit sailboats, houseboats, and certain food containers on Crooked Lake, the remaining question is whether the Forest Service may do the same. One factor that sets the instant action apart from all of the foregoing cases is the provision by Congress in each of the wilderness acts making any regulation "subject to" already "existing" property rights. This specific statutory limitation on the Forest Service's actions requires that we examine exactly what those "existing" rights are, and we do so in part IV below. First, however, we address plaintiffs' contention that Congress has not authorized the Forest Service to regulate under the Property Clause at all. Essentially, plaintiffs argue that the Forest Service cannot point to any statute that might give it the power to make "needful Rules and Regulations respecting" government property. According to plaintiffs, only "Congress" is named in the Property Clause and therefore only Congress may regulate, absent a specific legislative delegation.
 
 
 18
 The question of whether an agency has been granted authority to issue rules and regulations is a question of law and subject to de novo review. 5 U.S.C. Sec. 706(2)(C). See also Borlem S.A.--Empreedimentos Industriais v. United States, 913 F.2d 933, 937 (Fed.Cir.1990); Saratoga Savings and Loan Assoc. v. Federal Home Loan Bank Board, 879 F.2d 689, 691 (9th Cir.1989). Congressional delegation to the Forest Service is clearly present in the Organic Act of 1897, which authorizes the Secretary of Agriculture to "make such rules and regulations and establish such service as will insure the objects of [national forest] reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. Sec. 551. The National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. Sec. 1600 et seq., further directs that the Forest Service develop land and resource management plans "for units of the National Forest System," in order to administer these units properly. 16 U.S.C. Sec. 1604(a). The statutory language could not be plainer. The Secretary may make rules and regulations to protect the national forests, and Congress's ability to so delegate necessarily derives from its own ability to make rules and regulations under the Property Clause.[6] Of course, the Forest Service may only regulate pursuant to the Organic Act and NFMA in areas that Congress has specified, but such assignment is easily found in the language of the wilderness acts. In the MWA, which established the Sylvania Wilderness, Congress directed the Secretary of Agriculture to administer the wilderness "in accordance with the provisions of the Wilderness Act of 1964." Pub.L. No. 100-184, Sec. 5, 101 Stat. 1274, 1275-76 (1987). In the 1964 Act, Congress instructed the Forest Service along with other agencies to administer each designated wilderness with a view to "preserving the wilderness character of the area" and "for such other purposes for which it may have been established as also to preserve its wilderness character." 16 U.S.C. Sec. 1133(b). As noted earlier, the management prescriptions of Amendment No. 1 are indisputably designed to preserve the "wilderness character" of the designated areas, and thus there is a clear means-to-end fit between all of the pieces of the regulatory puzzle--between the authority to protect federal property under the Property Clause, the grant of regulatory authority under the Organic Act and NFMA, the directive to preserve "wilderness character" in the Wilderness Act, and the enhancement of wilderness character through Amendment No. 1's prohibition of sailboats, houseboats, and nonburnable food containers within the confines of the Sylvania Wilderness.
 
 
 19
 Plaintiffs claim that the Forest Service cannot regulate Crooked Lake pursuant to the Organic Act because the Wilderness Act provides that federal land may only be "designated as 'wilderness areas' " under the Wilderness Act itself or "a subsequent act," and the Organic Act is not a subsequent act. 16 U.S.C. Sec. 1131(a). This argument confuses "designation" or establishment of wilderness areas with simple management or regulation. The Sylvania Wilderness Area was designated by "a subsequent act"--the MWA--in 1987. This has nothing to do with the Forest Service's general regulatory powers, which it has possessed since its inception under the Organic Act. Under plaintiffs' theory, the Forest Service would have no regulatory authority over any of the national wilderness areas that the 1964 Act specifically instructs it to administer. There is no support for this theory.
 
 
 20
 Plaintiffs also make two other claims based on fundamental misreadings of text. First, they assert that Amendment No. 1 is inconsistent with a portion of the Weeks Act which states that the establishment of national forests will not deprive inhabitants of the forest area of "their rights and privileges as citizens." 16 U.S.C. Sec. 480. What plaintiffs seem to ignore is that this language, taken completely out of context, has no substantive bearing on their property rights under state law. Section 480 merely provides that both the state and the United States shall have general concurrent jurisdiction over individual citizens in forest areas. The "rights and privileges" and "duties" mentioned in the statute are those that attach to individuals "as citizens " of the state--those that pertain to the state's exercise of jurisdiction over its citizens. No authority exists for the proposition that this jurisdictional provision somehow shields plaintiffs from regulation by either sovereign.
 
 
 21
 Second, plaintiffs contend that the Forest Service itself admitted in its 1979 Final Environmental Statement, before the designation of the Sylvania Wilderness Area, that it had no authority to restrict activity on partially federal/partially private property. See Department of Agriculture, Forest Service, Final Environmental Statement: Roadless Area Review and Evaluation (RARE II), FS-325 at 73 (Jan. 1979). Plaintiffs are simply incorrect in their interpretation of RARE II. When the Forest Service states that "non-federal lands included within" wilderness areas "are not themselves classified" as wilderness, such a statement concerns classification only and has nothing to do with the Forest Service's regulatory authority. It is not an "acknowledgment" that the Forest Service cannot impose restrictions on wilderness that might affect land not "classified" as wilderness.[7] RARE II at 73. When the Forest Service states that it "may take active steps to either acquire title ... or have Congress adjust the wilderness boundary" if private ownership becomes incompatible with the wilderness, this does not mean, as plaintiffs apparently believe, that the Forest Service must acquire title whenever its regulations might have an impact on nearby private owners. Id. Finally, when the Forest Service states that "[w]ilderness designation in itself imposes no restrictions on use of the private land within or adjacent to wilderness," that is merely a description of what designation "in itself" does, and it has no relevance to the Forest Service's ability to regulate the wilderness once designated. Id.
 
 
 22
 In short, we hold that Congress has authorized the Forest Service to regulate the Sylvania Wilderness, and that when the Forest Service acts to preserve "wilderness character" under the Wilderness Act, the scope of authority--except to the extent that Congress may expressly limit it--is coextensive with Congress's own authority under the Property Clause.
 
 IV
 
 23
 What distinguishes this case from others applying the Property Clause is that the statutory scheme for the federal wilderness areas appears to make explicit room for state law.[8] Therefore, although the Forest Service might otherwise have the delegated authority to regulate in line with the Property Clause, Congress in the Wilderness Act and MWA expressly made such regulation "subject to existing private rights" or "subject to valid existing rights." In order to determine how much of a limitation this might be on the Forest Service, we must examine the scope of such "existing" rights under state law.
 
 
 24
 As indicated earlier, riparian rights are not absolute. Michigan law divides riparian uses into uses for "natural purposes," which are "those absolutely necessary for the existence of the riparian proprietor," and uses related to "artificial purposes," which are "those which merely increase one's comfort and prosperity." Thompson v. Enz, 379 Mich. 667, 154 N.W.2d 473, 483-84 (1967). Each use for an "artificial" purpose must be for the benefit of the underlying land and "reasonable in light of the correlative rights of the other proprietors." Id., 154 N.W.2d at 484. In other words, riparian uses such as sailing, waterskiing, and swimming are subject to "reasonable use" limitations and may not interfere materially with other riparian owners' similar rights. In Thompson, the court stated that a finding of reasonableness should center on three factors: (1) the "watercourse and its attributes," (2) the "use itself" and its effect on the water, and (3) the "consequential effects" on other riparian proprietors and the state. Id. at 484-85. The district court below applied Thompson 's three-factor approach and found that Amendment No. 1's restrictions were permissible under Michigan's "reasonable use" doctrine, since the United States was a riparian owner and its restrictions were reasonable. 843 F.Supp. 327, 333-34.
 
 
 25
 We do not agree that the "reasonable use" doctrine governs the federal government's actions in this case. Although the Thompson decision is important here because it shows that the riparian rights of private citizens are not absolute under Michigan law, the "reasonable use" doctrine itself only makes sense when one riparian owner challenges another's use as unreasonable and the court makes a subsequent determination of reasonableness. It is inapplicable when one riparian proprietor unilaterally decides to ban certain uses of others, whether or not the uses themselves are unreasonable, and whether or not the banning proprietor actually has the power to do so. Indeed, the federal government's ability to impose restrictions does not stem from its status as a fellow riparian proprietor; it stems from its status as a sovereign. Its authority to regulate cannot come from a state law doctrine that merely balances the property rights of private owners vis-a-vis one another. See Duncan Energy Company v. United States Forest Service, 50 F.3d 584, 588 (8th Cir.1995) ("Although North Dakota law protects the surface owner's property rights by limiting the mineral holder to the 'reasonable use' of the surface, North Dakota law does not, and could not, cloak the Forest Service with the specific authority to approve surface use plans ... [or even] to allow a surface owner to enjoin the unreasonable use of the surface.")
 
 
 26
 Instead, we find that Amendment No. 1's management prescriptions are permissible because they constitute a legitimate exercise of the sovereign's police power. The Michigan Supreme Court has explicitly held that local governments may regulate their citizens' riparian rights pursuant to their inherent police powers. In Miller v. Fabius Township Board, 366 Mich. 250, 114 N.W.2d 205 (1962), the court allowed time restrictions on waterskiing. In Square Lake Hills Condo. Assn. v. Bloomfield Township, 437 Mich. 310, 471 N.W.2d 321 (1991), the court allowed regulation of boat docking and launching. In Square Lake Hills, especially, the court made it clear that plaintiffs' recreational riparian rights were subject to regulation for the protection of "health, safety, and welfare" of the general public. Id., 471 N.W.2d at 322. The federal government's actions here are similar to those of the townships in Miller and Square Lake Hills, except that the "general public" in this case is the nation at large instead of the local community, and the power now comes from a highly particularized source, the Property Clause, rather than from the state's inherent powers. Kleppe in fact makes the comparison explicit: "[T]he general Government doubtless has a power over its own property analogous to the police power of the several States, and the extent to which it may go in the exercise of such power is measured by the exigencies of the particular case." 426 U.S. at 540, 96 S.Ct. at 2292, citing Camfield, 167 U.S. at 525, 17 S.Ct. at 867. Kleppe continues by stating that "Congress exercises the powers both of a proprietor and of a legislature over the public domain." 426 U.S. at 540, 96 S.Ct. at 2292.
 
 
 27
 Thus, the Forest Service possesses a power delegated to it by Congress that is "analogous to the police power," and its exercise of this federal power does not violate Congress's express limitation deferring to "existing" state law rights in the wilderness acts, so long as it does not exceed the bounds of permissible police power regulation under state law. The management prescriptions of Amendment No. 1 are clearly valid restrictions within the state law police power. According to Square Lake Hills, validity depends upon reasonableness, which in turn "depends upon the particular facts of each case." 471 N.W.2d at 324. "The test for determining whether an ordinance is reasonable requires us to assess the existence of a rational relationship between the exercise of police power and the public health, safety, morals, or general welfare in a particular manner in a given case." Id. (citations omitted). See also People v. McKendrick, 188 Mich.App. 128, 468 N.W.2d 903, 908 (1991). As has already been noted, Amendment No. 1's purpose of preserving wilderness character is undoubtedly a proper aim under the Property Clause's police power and under Congress's delegation to the Forest Service, and the prohibition of certain forms of mechanical transport and certain types of food containers on Crooked Lake is certainly rationally related to achieving this goal. The prohibitions are also a reasonable means of doing so. They do not affect plaintiffs' rights to "natural" riparian uses, only plaintiffs' "artificial" uses--in this case (as in Miller and Square Lake Hills), for "commercial profit and recreation." Thompson, 154 N.W.2d at 484. Plaintiffs do not argue that they need to use sailboats or houseboats in order to subsist, or even that they need them for transportation. In fact, as the district court found, "[t]here is no evidence that sailboats or houseboats, which are now banned, have ever been used on the lake." 843 F.Supp. at 334. Moreover, the determination that regulations should only apply to the area of the lake lying within the wilderness shoreline provides another reasonable limit on the scope of Amendment No. 1's prescriptions. Given the "minimal impact on plaintiffs' riparian uses of Crooked Lake," 843 F.Supp. at 334, we conclude that the Forest Service's restrictions here are a valid exercise of the police power under state law, and they are therefore a valid exercise of the police power conferred on the Forest Service by the Property Clause and limited by Congress's express reservation for state law rights in the wilderness acts. We reiterate that we do not refer to state law for the sake of determining the scope of Congress 's regulatory power under the Property Clause. State law only affects the Forest Service 's authority here, and it does so only because Congress has placed a specific constraint on the Forest Service's regulatory authority, requiring that it be exercised "subject to" plaintiffs' "existing" state law property rights.
 
 
 28
 If sailboats and houseboats have indeed never been used on Crooked Lake, one could justifiably ask why this action was even brought in the first place. The answer, it appears, is that plaintiffs are going after a bigger fish--Amendment No. 5, which regulates motorboat use on wilderness lakes. The Forest Service had not issued Amendment No. 5 when this case was originally filed, and the amendment does not go into effect until April 1996. Nevertheless, at various points in their brief, plaintiffs intertwine the Amendment No. 5 issue with their discussion of Amendment No. 1, and they use a significant amount of space to attack the merits of the motorboat restrictions. We decline plaintiffs' invitation to decide the motorboat issue, as it has not been properly presented in this court. Plaintiffs cannot short-circuit the administrative process by challenging Forest Service regulations here, before they have been decided upon in the appropriate agency proceedings. See Lavapies v. Bowen, 883 F.2d 465, 468 (6th Cir.1989) (citing Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)). The Secretary of Agriculture has set forth specific appeals procedures for land and resource management plans in 36 C.F.R. Sec. 217, and plaintiffs' appeal of Amendment No. 5 is currently making its way through this administrative pipeline. As plaintiffs have failed to exhaust their administrative remedies, we will not address their arguments regarding the motorboat restrictions.
 
 V
 
 29
 As a final matter, we note that plaintiffs moved for a stay pending appeal in this court on September 11, 1995.[9] We advanced the date of oral argument on the merits so that the stay motion and substantive appeal could be heard together. Because we decide this appeal adversely to plaintiffs on the merits, the issue of a stay "pending appeal" is now moot, and the motion must be denied. We observe, incidentally, that the motion was never stated in a manner in which it might have been granted. Plaintiffs first described the motion as one "for a stay pending a decision by this Court on an appeal of the District Court," "pursuant to Rule 62 [sic]." The motion then discussed Amendment No. 5 and the effect of the motorboat restrictions on plaintiffs. In conclusion, plaintiffs requested a stay "preventing the USFS from restricting access" to Crooked Lake, "preventing the USFS from implementing or notifying the public that motorboat restrictions will be implemented," and "permitting Appellants to use the entire lake for fishing, boating, and other recreational purposes pending a decision by this Court." Although it is entirely possible that by this ambiguous arrangement plaintiffs intended a stay of both the district court judgment regarding Amendment No. 1 and the administrative proceedings regarding Amendment No. 5, it is evident that they are mainly interested in the motorboat restrictions, and it is on this issue that they concentrated their efforts in the stay motion. To the extent that they seek a stay of the Forest Service's implementation of Amendment No. 5, the motion cannot be granted for the same reason that plaintiffs cannot prevail substantively on this issue on appeal: they have failed to exhaust their administrative remedies. Again, plaintiffs should not be permitted to circumvent legal procedures by bringing an appeal on an issue they care little about (restrictions on sailboats, houseboats, and containers) and then using it to halt an agency's actions on an issue they care a great deal about (restrictions on motorboats). To the extent that plaintiffs seek a stay of the district court's judgment and an injunction against Amendment No. 1's enforcement, the motion would have to be denied because there is no likelihood that plaintiffs could prevail on the merits.
 
 
 30
 For the foregoing reasons, plaintiffs' motion for a stay pending appeal is DENIED, and the district court's summary judgment in favor of the United States is AFFIRMED.
 
 
 
 [1]
 Secretary of Agriculture Michael Espy, originally named as a party, has been replaced by Daniel Glickman, his successor in office. See Fed.R.App.P. 43(c)(1)
 
 
 [2]
 We are told that "littoral" properly refers to property along a lake, whereas "riparian" refers to property along a river. Nevertheless, the word "riparian" may often be "used to describe both types of land and will be so used in this opinion." Thies v. Howland, 424 Mich. 282, 380 N.W.2d 463, 466 n.2 (1985)
 
 
 [3]
 We follow plaintiffs' self-designation and refer to Kathy Stupak-Thrall as "Thrall."
 
 
 [4]
 The United States, while reluctant to accept the district court's interpretation of "valid existing rights" in the MWA, has not appealed this determination. The government concedes also that plaintiffs' riparian rights are probably protected anyway under the Wilderness Act's provision regarding "existing private rights," which is incorporated by reference into the MWA. We therefore proceed under the assumption that riparian rights may be protected under either of the phrases "valid existing rights" or "existing private rights." Because we ultimately affirm on the ground that Amendment No. 1's restrictions would be a permissible exercise of the police power regardless of whether one or both phrases make an express reservation for riparian rights, we do not and need not decide the definitive interpretation of these terms. See infra part IV
 
 
 [5]
 As the United States points out, "mechanical transport" in 16 U.S.C. Sec. 1133(c) is defined by the Forest Service as "any contrivance which travels over ground, snow, or water on wheels, tracks, skids, or by floatation and is propelled by a nonliving power source contained or carried on or within the device." 36 C.F.R. 293.6(a). By adopting Amendment No. 1, the Forest Service has apparently further interpreted "nonliving power source contained or carried on or within the device" to include the wind that propels sailboats
 
 
 [6]
 No authority exists to support plaintiffs' implication that whereas the Property Clause might grant Congress broad regulatory powers, Congress's grant to the Forest Service is necessarily less extensive and can only reach property that is exclusively federal. Just the opposite is true. In United States v. Lindsey, 595 F.2d 5 (9th Cir.1979), Congress's exercise of authority over non-federal lands came in the form of "regulations issued by the Secretary of Agriculture." Id. at 6. Similarly, in United States v. Brown, 552 F.2d 817 (8th Cir.1977), the court upheld National Park Service Regulations prohibiting duck hunting on non-federal waters. In holding that such restrictions were within the scope of the Property Clause, the Eighth and Ninth Circuits evidently operated under the assumption that the Forest Service and Park Service had coextensive authority with Congress under the Clause. The Eighth Circuit's approach was reaffirmed in Duncan Energy Co. v. United States Forest Service, 50 F.3d 584, 588-89 (8th Cir.1995), where the court first alluded to Congress's "power under the property clause" and then stated that "Congress has given the Forest Service broad power to regulate Forest System land. [Citing the Organic Act.]" Without further discussion of the scope of the agency's power, the court went on to hold that the Forest Service could impose surface use restrictions on land owned by both the government and private plaintiffs. (In Duncan, the United States was owner of the surface, and plaintiffs were owners of the underlying mineral rights.) Again, the court apparently assumed full delegation of Congress's authority under the Property Clause to the Forest Service
 
 
 [7]
 In addition, plaintiffs fail to demonstrate why mixed federal/private property such as Crooked Lake should necessarily count as "non-federal," as opposed to "non-private."
 
 
 [8]
 Again, as explained in note 4, supra, the precise contours of the phrases "valid existing rights" and "existing private rights" need not be decided here
 
 
 [9]
 Plaintiffs properly moved first for a stay in the district court, which was denied on August 21, 1995