*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0255p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JAMES I. BURLISON, RODNEY L. WAITS, and BUFORD
O'NEAL TANKERSLEY,

                *Plaintiffs-Appellees,*

    *v.*

UNITED STATES OF AMERICA,

                *Defendant-Appellant.*

No. 06-6369

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 04-02597—Jon Phipps McCalla, Chief District Judge.

Argued: October 30, 2007

Decided and Filed: July 17, 2008

Before: BATCHELDER, MOORE, and COLE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Lane M. McFadden, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. J. Houston Gordon, LAW OFFICE OF J. HOUSTON GORDON, Covington, Tennessee, for Appellees. **ON BRIEF:** Lane M. McFadden, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. J. Houston Gordon, LAW OFFICE OF J. HOUSTON GORDON, Covington, Tennessee, for Appellees.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. This case concerns an appeal by the United States from a district-court decision holding that landowners in Tennessee possess an easement over a field-access road that traverses the Lower Hatchie National Wildlife Refuge. The landowners ("Plaintiffs-Appellees") sought to quiet title to the access road pursuant to the Quiet Title Act, 28 U.S.C. § 2409a, and the U.S. District Court for the Western District of Tennessee entered judgment in their favor. The United States also appeals the district court's holding that the National Wildlife Refuge System Administration Act of 1966, 16 U.S.C. § 668dd, as amended, does not give Congress or the United States Fish and Wildlife Service the authority to regulate Plaintiffs-Appellees' easement, which "predate[d] the Government's ownership of the servient tenement." *Burlison v. United States*, No. 04-2597, 2006 WL 2546564, at *10 (W.D. Tenn. Aug. 31, 2006). We

agree that Plaintiffs-Appellees have an easement by reservation over the field-access road. We also hold, however, that the federal government has the power under 16 U.S.C. § 668dd(d)(1)(b), enacted pursuant to the Property Clause, to regulate in a reasonable manner Plaintiffs-Appellees' use of their easement. We therefore **AFFIRM** the judgment of the district court in part and **REVERSE** in part.

## I. FACTS AND PROCEDURE

### A. Factual Background

The lands at issue in this case lie near the convergence of the Mississippi and Hatchie Rivers and the historic town of Fulton, in Lauderdale County, Tennessee. Joint Appendix ("J.A.") at 49 (Joint Pretrial Order at 12). Plaintiffs-Appellees James I. Burlison, Rodney L. Waits, and Buford O'Neal Tankersley own a two-thirds interest in the Rorie tract, which is at the southern-most tip of the lands. J.A. at 44-45 (Joint Pretrial Order at 7-8). The Rice tract lies directly to the north, and to the north of that tract lies the Sullivan tract. J.A. at 173 (1972 Map). The Rorie tract is landlocked; Plaintiffs-Appellees have and their predecessors had no means to access their lands except over the historic field-access road passing through the former Sullivan and Rice tracts, which now form part of a U.S. wildlife refuge. J.A. at 42 (Joint Pretrial Order at 5). The road travels along the old river bluff where the Mississippi used to flow, from Highway 87 to the banks of the Hatchie River. J.A. at 31 (Douglas Dep. at 25); J.A. at 49 (Joint Pretrial Order at 12); J.A. at 173 (1972 map).

#### 1. Succession of Title

The Rorie and Rice tracts and the majority of the Sullivan tract once formed part of lands held in unity by A. Lea & Co. J.A. at 43 (Joint Pretrial Order at 6). In 1888, the lands that later became the Rice and Rorie tracts were separated from the Lea property and assigned to the Bacon family. *Id.* By 1928, Myra Bacon Rice owned both the Rice and Rorie tracts. *Id.* Cyburn H. Sullivan, III bought what is now known as the Sullivan tract from Charles Shoaf, who inherited the land from his father, Charlie Shoaf. J.A. at 211 (Sullivan Dep. at 10). The record does not make clear when Charlie Shoaf bought the Sullivan tract from A. Lea & Co or when Sullivan bought the tract from Charles Shoaf, but the timing is immaterial.

In 1941, Myra Bacon Rice and her husband deeded what is now known as the Rorie tract to Elvy Rorie and his wife. J.A. at 44 (Joint Pretrial Order at 7). The tract then passed to Elvy Rorie's three children: Conrad J. Rorie, Virginia Rorie Wright, and Elvy Rorie, Jr., who held the land as tenants in common. Elvy Rorie, Jr. farmed the lands for the benefit of his co-tenants. *Id.* Upon his death in 1998, Elvy Jr.'s one-third interest in the lands passed to his three children, Elvy Rorie III, Margaret Rorie Sansom, and Susan Rorie Davis. *Id.* In 1999, the two daughters deeded their two-ninths interest in the Rorie tract to C&L Farms, Inc. *Id.* In 2002, Conrad J. Rorie and the heirs of Virginia Rorie Wright deeded their two-thirds interest in the Rorie tract to Plaintiffs-Appellees, who now hold the land in fee simple absolute. J.A. at 44-45 (Joint Pretrial Order at 7-8).

In 1993, the trustees of the Ralph E. Rice, Jr. and Hallie M. Rice Family Trust deeded the Rice tract to the U.S. government for use as a national wildlife refuge administered by the Secretary of the Interior, through the U.S. Fish and Wildlife Service (we hereinafter refer to this deed as "the Rice Deed"). J.A. at 485-86 (Rice Deed at 1-2). The grantors assigned all the legal and equitable rights to the property, "SUBJECT, HOWEVER, to existing easements for canals, ditches, flumes, pipelines, railroads, *public highways and roads*, telephone, telegraph, power transmission lines and public utilities." *Id.* at 486 (italics added). Thus, the title possessed by Plaintiffs-Appellees to the Rorie tract and the U.S. title to the Rice tract originated with a common owner: Myra Bacon Rice.

The government also owns the northern-most tract of the lands in question. In 1985, Cyburn Sullivan and his wife had deeded the Sullivan tract to the U.S. government, for use as a national

wildlife refuge (we hereinafter refer to this deed as "the Sullivan Deed"). J.A. at 510-11 (Sullivan Deed at 1-2). The United States acquired the land in fee simple and "unencumbered SUBJECT, HOWEVER, to . . . [e]xisting easements for canals, ditches, flumes, pipelines, railroads, *public highways and roads*, telephone, telegraph, power transmission lines and public utilities." *Id.* at 512 (italics added).

### 2. Use of the Access Road

The partition of the A. Lea & Co. lands to the Bacon family in 1888 did not expressly grant any easement in favor of the landlocked property now known as the Rice and Rorie tracts. J.A. at 159 (Rice Dep. at 43). From 1941 forward, however, Plaintiffs-Appellees and their predecessors (members of the Rorie family) used the field-access road through the property of the federal government's predecessors in title (Shoaf, Sullivan, Rice) to access their lands. J.A. at 45 (Joint Pretrial Order at 8). Milton Rice testified that he and his family recognized the Rories' right to use the road over the Rice tract, without needing to ask for permission. J.A. at 131 (Rice Dep. at 15). Similarly, during the time that members of the Rice family owned the Rice tract, they enjoyed access to the road over the Sullivan tract, without needing to ask permission from the people who owned the lands to the north. J.A. at 125, 131-32 (Rice Dep. at 9, 15-16). Occasionally, Charles Shoaf would put a gate up on the access road, but Rorie could always get a key and Rice also obtained a key through Rorie. J.A. at 128 (Rice Dep. at 12). Furthermore, Cyburn Sullivan, III testified that when he purchased the Sullivan tract from Charles Shoaf, Shoaf told him that an easement traversed the property; accordingly, Sullivan never required Rice to ask permission to use the road. J.A. at 217-18 (Sullivan Dep. at 16-17).

There exists some confusion in the record as to whether any lands were at one time sold off the Sullivan tract. J.A. at 123-24 (Rice Dep. at 7-8). Regardless of the nature and timing of the sales, purchasers who owned property south of Highway 87 had to use the field road to access their properties. J.A. at 148-50 (Rice Dep. at 32-34).

After the federal government purchased first the Sullivan and, later, the Rice tracts, the Rice and Rorie families enjoyed continued use of the field-access road. Milton Rice testified that the government never put him on notice that it had the "right to prevent me or my family members (as owners), or anyone else to whom we gave permission to go on to the Rice lands, from using the roadway at any time we chose to do so." J.A. at 178 (Rice Aff. at 4). In 1991, the Fish and Wildlife Service put up a gate on the field-access road between the Sullivan and Rice tracts. The Fish and Wildlife Service issued a key to Milton Rice pursuant to a Special Use Permit, to enable him to access the Rice tract south of the national wildlife refuge located on the Sullivan tract. J.A. at 143-45 (Rice Dep. at 27-29); J.A. at 197 (Permit Letter). Rice, however, testified that he understood the key not to restrict his access but rather to enable him, as well as Rorie, to access their properties when the road was closed to the general public during the waterfowl-migration season, from November 15 to March 15. J.A. at 145 (Rice Dep. at 29). The Fish and Wildlife Service issued keys and Special Use Permits to Milton Rice and Elvy Rorie, Jr., among other individuals, in 1991, and to Elvy Rorie, Jr. in 1993, 1994, 1995, 1996, 1997, and 1999. J.A. at 461-73 (Defendant's Exs. 54-63). The Fish and Wildlife Service issued a key and Special Use Permit to Plaintiff-Appellee Tankersley in 2002. J.A. at 475 (Defendant's Ex. 65).

In 2002, the government locked a gate across the field-access road and denied Plaintiffs-Appellees permission to use the road between November 15, 2002 and March 15, 2003.[1] A

---

[1] There exists some confusion regarding the year in which the government locked the gate. The Amended Complaint states that the government "in 2003 . . . locked a gate across the roadway [and] denied Plaintiffs permission to use the roadway between November 15 and March 15, 2003." J.A. at 30 (Amended Compl. at 8). Of course, this statement must contain a mistake because the period between November and March spans two years. Either the

government agent told Plaintiffs-Appellees on November 20, 2003, that, "I just don't want you on the access road. It disturbs the waterfowl and damages the road." *Id.* On November 15, 2004, the government again prevented Plaintiffs-Appellees from using the road by locking a metal gate across it. J.A. at 31 (Amended Compl. at 9).

### 3. Negotiation of the Rice and Sullivan Deeds

Sullivan testified that when he sold his tract to the government, he intended for the Sullivan Deed to recognize the easements held by Rice and Rorie over the property. At the closing of the purchase agreement, Sullivan asked his attorneys, "Do we need to put in this existing easement or any further of it?" J.A. at 233 (Sullivan Dep. at 32). Sullivan testified that his attorneys replied that the language in the Sullivan Deed regarding "existing easements for roads" recognized the Rice and Rorie easements. *Id.* Sullivan reiterated: "I don't want to hurt my neighbors, Rice and Rorie." *Id.* His attorneys replied: "No, we're aware that Rice and Rorie have a way to get into this property, and this is part of it [the Rice Deed]." *Id.*

Before the delivery of the Rice Deed from Rice to the United States, the Rice family's attorney and the Fish and Wildlife Service exchanged letters. The Rice family attorney, Barrett Ashley, wrote a letter dated January 11, 1993 to Roseann Christ, Senior Realty Specialist, Fish and Wildlife, U.S. Department of the Interior. The letter stated:

> At that time [summer 1992], we discussed the Rice family's concern that the access road to the Rorie tract remain an easement or reservation as to the title. You agreed that would be done.
>
> Accordingly, we have construed Paragraph 2 of the Sales Agreement, which refers to easements or reservations, to include that particular access road in the reference in that language to 'roads'. . . .
>
> Upon this understanding, Mr. Rice has authorized the delivery of the deed conveying this property to the United States Department of the Interior purporting to grant a title unencumbered, except as set forth in said Agreement and as above referenced.

J.A. at 404 (Ashley Letter). Randy Cook, as an agent of the United States, wrote Ashley a letter dated January 13, 1993. The letter stated:

> It is the policy of the U.S. Fish and Wildlife Service to afford inholders with reasonable access to their property. We do not view the deed from Mr. Rice to the United States as infringing upon any right that might be held by Elvy Rorie, Jr. We have discussed this with our counsel in the Solicitor's Office in Atlanta and he has advised us that this letter should serve to satisfy Mr. Rice's concerns. Therefore, we are hopeful that Mr. Rice feels confident that this matter is resolved.

J.A. at 436 (Cook Letter).

## B. Legal Background

The Quiet Title Act provides that "[t]he United States may be named as a party defendant

---

government locked the gate in 2003, denying access from November 2003 through March 2004, or the government locked the gate in 2002. Because Plaintiffs-Appellees' brief states that the government denied the existence of the easement for the first time in 2002, we assume the government first locked the gate and denied access in November 2002. Plaintiffs-Appellees Br. at 15.

in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights." 28 U.S.C. § 2409a(a). The Act provides the exclusive basis for jurisdiction over suits challenging whether the United States holds title to real property. *United States v. Mottaz*, 476 U.S. 834, 841 (1986) (citing *Block v. North Dakota*, 461 U.S. 273, 286 (1983)). The Act requires a complaint to "set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States." 28 U.S.C. § 2409a(d).

The National Wildlife Refuge System Administration Act of 1966, Pub. L. No. 89-669, 80 Stat. 927, was amended by the National Wildlife Refuge System Improvement Act of 1997, Pub. L. No. 105-57, 111 Stat. 1252-1260. These statutes, codified at 16 U.S.C. §§ 668dd-668ee (hereinafter "Refuge Act"), provide for administration of the National Wildlife Refuge System by the Fish and Wildlife Service. "The mission of the System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2). The Refuge Act mandates that the Secretary of the Interior administer the System to "provide for the conservation of fish, wildlife, and plants, and their habitats within the System; [and] ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(4)(A)-(B).

The Refuge Act prohibits certain activities within the System and also authorizes the Secretary of the Interior to allow specified uses of the refuge areas. The Refuge Act states: "No person shall . . . possess any real or personal property of the United States . . . in any area of the System . . . or enter, use, or otherwise occupy any such area for any purpose[,] . . . unless such activities are permitted either under subsection (d) of this section or by express provision of the law . . . ." 16 U.S.C. § 668dd(c). Subsection (d) authorizes the Secretary of the Interior, pursuant to the regulations he prescribes, to "permit the use of any area within the System for any purpose, including but not limited to hunting, fishing, public recreation and accommodations, and access whenever he determines that such uses are compatible with the major purposes for which such areas were established." 16 U.S.C. § 668dd(d)(1)(A). The subsection also authorizes the Secretary of the Interior, pursuant to the regulations he prescribes, to:

> permit the use of, or grant easements in, over, across, upon, through, or under any areas within the System for purposes such as but not necessarily limited to, powerlines, telephone lines, canals, ditches, pipelines, and roads . . . whenever he determines that such uses are compatible with the purposes for which these areas are established.

16 U.S.C. § 668dd(d)(1)(B).

The Refuge Act authorizes the Secretary of the Interior to issue regulations enforcing the Act. 16 U.S.C. § 668dd(b)(5). The Secretary's regulations controlling access to National Wildlife Refuge lands prohibit persons from entering a refuge without a permit. 50 C.F.R. § 26.21. "A permit shall be required for any person entering a national wildlife refuge, unless otherwise provided under the provisions of subchapter C." 50 C.F.R. § 26.22(b). The use of private rights-of-way is not included in the exemptions outlined in subchapter C. 50 C.F.R. § 26.27.

## C. Procedural History

Plaintiffs-Appellees filed a complaint in the U.S. District Court for the Western District of Tennessee on August 2, 2004 pursuant to § 2409a. J.A. at 11 (Compl. at 1). The district court held

a bench trial on March 3, 2006, and issued judgment for the landowners on August 31, 2006.  J.A. at 556 (Dist. Ct. Op.); J.A. at 583 (Judgment).  The district court found it appropriate under Tennessee law to use parol evidence to interpret the Rice and Sullivan Deeds at issue, and found that the parol evidence supported the conclusion that the Rice and Sullivan Deeds granted an express easement.  The district court also held that the Refuge Act did not grant the Secretary of the Interior power to terminate or regulate the use of Plaintiffs-Appellees' easements because the government had neither granted the easement nor created the dominant tenement.  The government as Defendant-Appellant now argues that the plain language of the Rice and Sullivan Deeds is unambiguous, and that the deeds do not reserve easements over the road.  The government also argues that even if this court concludes that the Rice and Sullivan Deeds granted an express easement, the government has the power to regulate use of the wildlife refuge, and specifically the use of easements, under the Refuge Act enacted pursuant to the Property Clause of the U.S. Constitution.

## II.  ANALYSIS

We interpret a claim under the Quiet Title Act in accordance with principles of federal law, but look to state law for aid in applying the statute to the facts of the case so long as the state law is compatible with federal policy.  *See Bank One Tex. v. United States*, 157 F.3d 397, 403 (5th Cir. 1998), *cert. denied*, 526 U.S. 1115 (1999); *Harrell v. United States*, 13 F.3d 232, 234-35 (7th Cir. 1993); *North Dakota v. Block*, 789 F.2d 1308, 1312 (8th Cir. 1986); *Fulcher v. United States*, 696 F.2d 1073, 1076 (4th Cir. 1982).

### A.  The Existence of an Easement

Tennessee law recognizes that easements can be created in multiple ways, including:  express grant, reservation, implication, prescription, estoppel, and eminent domain.  *Cellco P'ship v. Shelby County*, 172 S.W.3d 574, 588 (Tenn. Ct. App. 2005).  "An easement is an interest in property that confers on its holder an enforceable right to use another's property for a specific purpose." *Bradley v. McLeod*, 984 S.W.2d 929, 934 (Tenn. Ct. App. 1998).  Plaintiffs-Appellees claim that they have the right to an easement appurtenant over the Sullivan and Rice tracts.  As opposed to easements or profits in gross whose benefits serve particular individuals, an easement appurtenant involves two tracts of land, in which "[t]he dominant tenement benefits in some way from the use of the servient tenement." *Fowler v. Wilbanks*, 48 S.W.3d 738, 740 (Tenn. Ct. App. 2000) (quoting *Pevear v. Hunt*, 924 S.W.2d 114, 116 (Tenn. Ct. App. 1996)); *see also* WILLIAM B. STOEBUCK AND DALE A. WHITMAN, THE LAW OF PROPERTY § 8.2 (3d ed. 2000).

#### 1.  Easement by Implication or Necessity

Plaintiffs-Appellees have the burden of proving the facts that are required to establish an easement by implication.  *The Pointe, LLC v. Lake Mgmt. Ass'n*, 50 S.W.3d 471, 478 (Tenn. Ct. App. 2000).  These facts include:

> (1) A separation of the title; (2) Necessity that, before the separation takes place, the use which gives rise to the easement shall have been so long continued and obvious or manifest as to show that it was meant to be permanent; and (3) Necessity that the easement be essential to the beneficial enjoyment of the land granted or retained.

*Id.* (quotation marks omitted).  We are bound, absent clear error, by the district court's factual determination that there is no evidence that an easement over the access road existed at the time of the partition of the A. Lea & Co. lands in 1888.  *Burlison*, 2006 WL 2546564, at *5.  Therefore, having failed to show clear error, Plaintiffs-Appellees cannot establish that an easement by implication existed as a matter of law.

The requirements for the creation of an easement by necessity are similar to those for the creation of an easement by implication. An easement by necessity can be proved by establishing the following facts:

> 1) [T]he titles to the two tracts in question must have been held by one person; 2) the unity of title must have been severed by a conveyance of one of the tracts; 3) the easement must be necessary in order for the owner of the dominant tenement to use his land with the necessity existing both at the time of the severance of title and the time of exercise of the easement.

*Cellco*, 172 S.W.3d at 592. The Tennessee courts interpret "necessity" to mean "'reasonably necessary' for the enjoyment of the dominant tenement." *Fowler*, 48 S.W.3d at 741.

We believe that under Tennessee law Plaintiffs-Appellees may have an easement by necessity over the Rice and Sullivan tracts. The parties do not dispute that the Rorie tract is landlocked. Extensive evidence in the record exists regarding the necessity of using the field-access road to reach the Rice and Rorie tracts. This necessity exists today and also existed in 1941 when the Rice and Rorie tracts were severed from each other and in 1888 when the Sullivan tract was severed from the Rice and Rorie tracts. The question of whether there existed unity of title, however, poses an obstacle to finding an easement by necessity. Plaintiffs-Appellees argue that unity of title existed because A. Lea & Co. owned all three of the tracts in question—the Sullivan, Rice, and Rorie tracts—and that therefore the severing of the tracts in 1888 and 1941 created easements by necessity. The government argues that unity of title cannot be established because the district judge identified an unresolved question of fact whether a common owner ever held all the lands over which the field-access road traverses. The access road crosses the Slattery lands, which were not owned by A. Lea & Co. and which became part of the Sullivan tract, now owned by the government, at an unknown date after 1888.

Thus, a portion of the servient estate, here the Sullivan tract, was not held by the single owner who possessed the rest of the servient estate and the dominant estate. The key question is whether this fact defeats unity of title. The policy rationale behind the doctrine of easement by necessity is that a grantor should be viewed as conveying not only property but also that which is necessary to enjoy the conveyed property. RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 2.15 (1998). In addition, public policy favors a legal rule that promotes occupation and use of the land. *Id.* An easement by necessity, however, is a sub-category within the broader category of easements by implication, which rest on the theory that the sole owner enjoyed a quasi-easement over a portion of his or her land in favor of another portion of the land and that upon severance the easement passes to the grantee. *Jones v. Whitaker*, 12 Tenn. App. 551, 1931 WL 1509, at *2 (1930); RESTATEMENT (THIRD) OF PROP.: SERVITUDES §§ 8.4-8.5. Therefore, there can be no easement by necessity over the land of strangers. *See McBurney v. Glenmary Coal & Coke Co.*, 118 S.W. 694, 700 (1909) ("There is no privity of contract in the estate between the complainants and defendants, but as to each other they are as strangers, and under well-settled principles there can be no way of necessity or right of easement over the defendant's land."); *see also Ondis v. City of Woonsocket*, 934 A.2d 799, 805 (R.I. 2007) (holding that one cannot hold an easement of necessity against the lands of a stranger); *Kullick v. Skyline Homeowners Ass'n*, 69 P.3d 225, 230 (Mont. 2003) (same); *Riffle v. Worthen*, 939 S.W.2d 294, 298 (Ark. 1997) (same); *Pencader Assocs., Inc. v. Glasgow Trust*, 446 A.2d 1097, 1099 (Del. 1982) (same); *Close v. Rensink*, 501 P.2d 1383, 1387 (Idaho 1972) (same); *Poulos v. Dover Boiler & Plate Fabricators*, 76 A.2d 808, 811 (N.J. 1950) (same). In support of their argument that contiguity is not needed to demonstrate an easement by necessity, Plaintiffs-Appellees cite the Tennessee Court of Appeals decision in *Pevear v. Hunt*, 924 S.W.2d 114, 116 (Tenn. Ct. App. 1996), which held that contiguity is not essential to an easement by prescription. *Pevear*, however, is inapposite. An easement by prescription has no unity-of-title requirement; thus, the logic of *Pevear* cannot be applied to overcome lack of unity of title over the entire servient estate

through which a claimed easement by necessity traverses. We do not need to resolve the dilemma created by question of unity of title today, however, because we need not decide whether an easement by necessity existed.

### 2. Easement by Prescription

Next, we consider Plaintiffs-Appellees' claim that they have a right to an easement by prescription over the Sullivan and Rice tracts. "To create a prescriptive easement, the use and enjoyment of the property must be adverse, under a claim of right, continuous, uninterrupted, open, visible, exclusive, with the knowledge and acquiescence of the owner of the servient tenement, and must continue for the full prescriptive period." *Pevear*, 924 S.W.2d at 116. The Quiet Title Act, however, may foreclose Plaintiffs-Appellees' claim because it provides that "[n]othing in this section shall be construed to permit suits against the United States based upon adverse possession." 28 U.S.C. § 2409a(n). Plaintiffs-Appellees argue that the Quiet Title Act does not foreclose adverse-possession claims that ripened before the government acquired title to the lands in question. At least three district courts have reached the conclusion that such suits do not constitute claims of adverse possession *against* the United States, but rather are claims of adverse possession against the prior owner. *Tadlock v. United States*, 774 F. Supp. 1035, 1037-38 (S.D. Miss. 1990); *Brewer v. United States*, 562 F. Supp. 128, 133 (E.D. Mo. 1983); *Watts v. United States*, No. 8:00CV552, 2002 WL 87056, at *3 (D. Neb. Jan. 23, 2002) (unpublished opinion). Thus, Plaintiffs-Appellees' claim may be cognizable to the extent that it argues that they had an easement over the field-access road prior to the government's purchase of the Rice and Sullivan tracts, rather than that they obtained an easement against the government via adverse possession.

Even if the panel were to allow the claim, however, Plaintiffs-Appellees have not met their burden of proving adverse possession. Their own evidence arguably demonstrates that they and their predecessors enjoyed permission from the Rice and Sullivan families to use the field-access road. A permissive use of a roadway cannot amount to the adverse use required to sustain a claim of easement by adverse possession. *Lively v. Noe*, 460 S.W.2d 852, 854 (Tenn. Ct. App. 1970). We do not need to resolve either the factual or legal issues surrounding a possible easement by prescription today, however.

### 3. Easement by Reservation

Lastly, we assess Plaintiffs-Appellees' claim that the Rice and Sullivan Deeds reserved easements that now provide Plaintiffs-Appellees with the right to use the field-access road traversing these tracts. The Rice and Sullivan Deeds are contracts and, therefore, under Tennessee law we apply de novo review regarding their interpretation. *See Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). To interpret the deeds, we begin with their plain language. "If the easement is claimed under a grant, the extent of the easement is determined by the language of the grant." *Foshee v. Brigman*, 129 S.W.2d 207, 208 (Tenn. 1939). The key provision, identical in both the Rice and Sullivan Deeds, is that which conveys the land to the government with the exception of "existing easements for . . ., public highways and roads, . . . ." J.A. at 485-86 (Rice Deed at 1-2); J.A. at 512 (Sullivan Deed at 3).

The government argues that the term "public" modifies both "highways" and "roads." Defendant-Appellant Br. at 16-18. In *Oscar W. Larson Co. v. United Capitol Insurance Co.*, 64 F.3d 1010, 1013 (6th Cir. 1995), we held that "[i]n a sequence separated by commas, a modifier runs to the end of the phrase, or until the next comma." In other words, in a sequence of nouns such as the one in question, an adjective preceding two nouns that are separated by "and" will modify both

nouns.**2**  Accordingly, the government argues that the Rice and Sullivan Deeds expressly reserved only those existing easements for *public* roads and that the field-access road in question is not public.  The government relies on an early Sixth Circuit description of "public highways and roads" as those to which "[t]he State or its political subdividision, holds, as a trustee, title to the easement." *Jefferson County v. Tenn. Valley Auth.*, 146 F.2d 564, 565 (6th Cir. 1945).

The government's argument regarding whether the adjective "public" modifies the noun "road," however, is a red herring.  The question in this case is not the legal definition of a public road but what the parties understood to constitute an "existing easement."  "In construing the deed . . . we are concerned solely with the grantor's intention as gathered from the language of the deed and surrounding circumstances." *Hutchison v. Board*, 250 S.W.2d 82, 84 (Tenn. 1952).  Even if we accept that "public" modifies the term "road," our task is to determine whether the parties understood the field-access road to be a public road and whether they intended the deeds to reserve an easement over that road.

The government argues that we can consider neither the letters exchanged between Ashley and Cook in connection with the Rice Deed nor Sullivan's testimony regarding the Sullivan Deed because that evidence must be excluded under the parol-evidence rule.  "The general rule is that parol evidence is not admissible to contradict a written agreement, whether simple or by deed." *Clayton v. Haury*, 452 S.W.2d 865, 867 (Tenn. 1970).  More specifically, "parol evidence cannot be admitted to contradict or vary the terms or to enlarge or diminish the obligation of a written instrument or deed, except on grounds of fraud, accident or mistake." *Id.* at 867-68.  Parol evidence is thus generally not admissible except to resolve an ambiguity in the plain language of the contract. *Jones v. Brooks*, 696 S.W.2d 885, 886 (Tenn. 1985).  Parol evidence may be admitted when a provision of the contract can be construed according to more than one reasonable interpretation. *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001).  But the fact that parties in a case interpret the contract differently does not by itself render the contract ambiguous. *Campora v. Ford*, 124 S.W.3d 624, 628 (Tenn. Ct. App. 2003).  "'Closely allied to the parol evidence rule, although not necessarily a part of same, . . . is the rule that prior agreements, whether oral or written, are merged into the written contract as finally executed.'" *First State Bank of Wayne County v. City & County Bank of Knox County*, 872 F.2d 707, 712-13 (6th Cir. 1989) (quoting *Marron v. Scarbrough*, 314 S.W.2d 165, 182 (Tenn. Ct. App. 1958)).

We believe that the government's argument that we must exclude Ashley's and Cook's letters misconstrues the nature of the parol-evidence rule.  Several decades ago, the great contracts scholar Arthur L. Corbin distinguished between parol evidence and evidence admissible for the purpose of aiding interpretation.  "Even if a written document has been assented to as the complete and accurate integration of the terms of a contract, it must still be interpreted and all those factors that are of assistance in this process may be proved by oral testimony."  Arthur L. Corbin, *The Parol Evidence Rule*, 53 YALE L. J. 603, 622 (1944).  More recently, academic authority has recognized that although courts often conflate the parol-evidence rule with the plain-meaning rule, "[a] clear conceptual division would treat the plain meaning rule as about interpreting the provisions of contracts, and the parol evidence rule as about establishing what count as the controlling terms of integrated contracts."  Kent Greenawalt, *A Pluralist Approach to Interpretation:  Wills and Contracts*, 42 SAN DIEGO L. REV. 533, 587 (2005).  Evidence regarding the parties' intentions as to what constituted an existing easement over a public road does not "contradict or vary the terms" of the Rice and Sullivan Deeds, *Clayton*, 452 S.W.2d at 868, but rather aids in their interpretation.

---

**2** We are not aware of any rule applied by the Tennessee state courts that is contrary to the Sixth Circuit's rule of grammatical construction.

Tennessee law is consistent with the distinction between parol evidence and evidence admissible to supplement the terms and to aid in the interpretation of a contract. First, the Tennessee Court of Appeals has held that "as an aid to finding [the parties'] intention, the court may consider the situation of the parties, the business to which the contract relates, the subject matter of the contract, the circumstances surrounding the transaction, and the construction placed on the contract by the parties in carrying out its terms." *Silva v. Buckley*, No. M2002-00045-COA-R3-CV, 2003 WL 23099681, at *2 (Tenn. Ct. App. Dec. 31, 2003) (unpublished opinion) (citing *Simonton v. Huff*, 60 S.W.3d 820, 825 (Tenn. Ct. App. 2000)).

Second, Tennessee courts allow the admission of evidence useful in resolving latent as opposed to patent ambiguities in contracts. A latent ambiguity exists where:

> the equivocality of expression, or obscurity of intention, does not arise from the words themselves, but from the ambiguous state of extrinsic circumstances to which the words of the instrument refer, and which is susceptible of explanation by the mere development of extraneous facts, without altering or adding to the written language, or requiring more to be understood thereby than will fairly comport with the ordinary or legal sense of the words and phrases made use of.

*Mitchell v. Chance*, 149 S.W.3d 40, 44 (Tenn. Ct. App. 2004). Where latent ambiguities arise as a result of confusion about what the terms of a contract reference, the Tennessee courts admit extrinsic evidence to supplement the terms. *Brown v. Berry*, 46 Tenn. 98, 1868 WL 2178, at *1-*2 (Tenn. 1868) (admitting parol evidence to determine that a right-of-way existed under the terms of a deed that conveyed land along with all the "hereditaments, rights, privileges and appurtenances, belonging or in any way appertaining to the land"); *Faithful v. Gardner*, 799 S.W.2d 232, 236 (Tenn. Ct. App. 1990) (admitting parol evidence regarding the circumstances of a real-estate sale to determine that the contract *unambiguously* reflected the intention of the parties "to enter into a sale and purchase in gross"); *Miller v. Street*, 663 S.W.2d 797 (Tenn. Ct. App. 1983) (admitting parol evidence to establish the location of a spring and spring house referred to in a deed).

Third, Tennessee courts admit evidence regarding the conditional character of a deed's delivery. "[I]t is the intention of the grantor of a deed . . . that determines whether a delivery of the instrument is absolute or conditional, even though such delivery may be made to the grantee of the deed." *Miller v. Morelock*, 206 S.W.2d 427, 431 (Tenn. 1947). Whether the delivery of a deed is conditional is a question of fact, *Bowman v. Bowman*, 836 S.W.2d 563, 565-66 (Tenn. Ct. App. 1991), and evidence can be admitted to illuminate whether the parties intended a deed's delivery to be conditional or absolute. *Early v. Street*, 241 S.W.2d 531, 534 (Tenn. 1951); *Tanksley v. Tanksley*, 239 S.W. 766, 766-67 (Tenn. 1922).

In light of the above three Tennessee doctrines, we conclude that the parol-evidence rule does not prevent us from considering the Ashley and Cook letters and the Sullivan testimony to aid our interpretation of the deeds. Ashley's letter (date January 11, 1993 and sent by certified mail) explicitly stated that the Rice family intended "that the access road to the Rorie tract remain an easement or reservation as to the title." J.A. at 404. The letter proceeded: "we have construed Paragraph 2 of the Sales Agreement, which refers to easements or reservations, to include that particular access road in the reference in that language to 'roads'. . . ." *Id.* Cook's letter (dated January 13, 1993) stated: "[w]e do not view the deed from Mr. Rice to the United States as infringing upon any right that might be held by Elvie Rorie, Jr." J.A. at 436. The government argues that Cook's letter should not be understood as responsive to Ashley's letter, but this argument is implausible. Ashley's and Cook's letters thus enable the panel to resolve the latent ambiguity in the deed as to what easements existed at the time of purchase. The letters show that an easement over the field-access road constituted an "existing easement[]" referenced by the deed. In addition, Ashley's letter shows that the Rice family conditioned the delivery of the deed on the government's

acceptance of an easement over the field-access road as a reservation to the United States' title. Referencing prior discussion of the easement, the Ashley letter stated: "Upon this understanding, Mr. Rice has authorized the delivery of the deed conveying this property to the United States Department of the Interior purporting to grant a title unencumbered, except as set forth in said Agreement and as above referenced." J.A. at 404 (Ashley Letter). Finally, the letters illuminate the subject matter of the Rice Deed by showing that the road referred to in the deed meant the field-access road.

The government argues that even if this court determines that the Rice Deed reserved an easement, the parol evidence does not similarly demonstrate an easement over the Sullivan tract. Sullivan, however, testified at trial that he intended for the Sullivan Deed to reserve an easement over the road for the benefit of his neighbors. J.A. at 233 (Sullivan Dep. at 32). Sullivan further testified that his attorney reassured him that the language in the deed regarding "existing easements for roads" recognized the easement over the field road. *Id.* We believe that, while this evidence is far from overwhelming, it is enough, uncontradicted, to conclude that the reference in the Sullivan Deed to an existing easement over a public road signified the easement over the field-access road. We therefore conclude that the 1985 Sullivan Deed and 1993 Rice Deed reserved an express easement for use of the field-access road over the Sullivan and Rice tracts, respectively.

## B. The Extent of Federal Government Authority to Regulate Existing Easements

Having determined that Plaintiffs-Appellees have an easement by reservation, we next consider whether Congress has the power to regulate the easement under the Property Clause of the U.S. Constitution and, if so, whether the Refuge Act has authorized the Secretary of the Interior via the Fish and Wildlife Service to regulate the easement.

### 1. Property Clause of the U.S. Constitution

The Property Clause of the U.S. Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST., ART. IV, § 3, cl. 2. Plaintiffs-Appellees argue that the Property Clause is not applicable in the present case because the government never owned the easement in question. The power to regulate federal lands, however, includes the power to regulate in a manner affecting non-federal property. In *Kleppe v. New Mexico*, 426 U.S. 529 (1976), the Supreme Court upheld the constitutionality of the federal Wild Free-Roaming Horses and Burros Act as applied to prevent the New Mexico Livestock Board from retrieving animals which had strayed from private onto public lands. The Court in *Kleppe* established that the Property Clause should be read expansively because "[t]he power over the public land thus entrusted to Congress is without limitations." *Kleppe*, 426 U.S. at 539 (quotation marks omitted). Accordingly, the Court found "that regulations under the Property Clause may have some effect on private lands not otherwise under federal control." *Id.* at 546 (citing *Camfield v. United States*, 167 U.S. 518 (1897)).

Plaintiffs-Appellees argue that *Kleppe* does not support the government's position in the instant case because the Court in *Kleppe* declined to decide whether the Property Clause gives Congress the power to advance the regulation of federal lands by regulating animals on private land. *See id.* Although the Court found that the government may regulate public land in a manner that affected private land, the Court did not answer the more difficult question of whether the Property Clause gives Congress the power directly to regulate private land. The narrower doctrine that Congress may regulate public land in a manner affecting private land suffices to decide the extent of Congressional authority in the instant case, however. The Refuge Act does not target private land for regulation but rather regulates public land, in a manner that may affect private property rights in easements over the public land.

We reject the counterargument that because the easement is a private property interest in the public land, regulation of the easement constitutes a direct regulation of private property insupportable under *Kleppe*. Precedent from the Eighth Circuit supports a broad interpretation of Congress's power to regulate a dominant estateholder's use of an easement in a servient estate located on public lands. In *Duncan Energy Co. v. United States Forest Service*, 50 F.3d 584, 589 (8th Cir. 1995), the Eighth Circuit interpreted *Kleppe* to stand for the principle that "Congress may regulate conduct occurring on or off federal land which affects federal land." The case addressed whether the Forest Service has the authority to require approval of surface-use plans by holders of mineral rights. Although the surface national forest formed the servient estate and the mineral rights formed the dominant estate, the Eighth Circuit determined that Forest Service regulations issued under a federal law enacted pursuant to the Property Clause gave the Service the power to regulate surface access to private mineral rights. *Id.* at 588-89. Likewise, Congress has the power to regulate access in this case by holders of the dominant estate, i.e., Plaintiffs-Appellees, to the servient estate, i.e., the parts of the Lower Hatchie National Wildlife Refuge comprised of the Sullivan and Rice tracts. The logic of *Duncan* supports our conclusion that while *Kleppe* did not decide whether Congress could regulate directly private property interests respecting wholly private land, the holding of *Kleppe* is sufficiently broad to authorize Congressional regulation of private-property interests that are also located on public land.

The Ninth and Tenth Circuits have similarly concluded that the Property Clause gives Congress the power to regulate privately held easements over federal land. In *United States v. Jenks*, 22 F.3d 1513, 1517 (10th Cir. 1994) (*Jenks II*), the Tenth Circuit rejected a landowner's argument that his common-law-easement rights exempted him from regulations requiring him to apply for a special-use permit to cross Forest Service land to access his property. The Tenth Circuit cited the Property Clause of the U.S. Constitution for the principle that "Congress has the authority and responsibility to manage federal land." *Id.* In 1988, the Ninth Circuit had held that even if a trail across federal National Park lands constituted a right-of-way, as argued by the defendant landowner, the federal government possessed "authority to regulate the manner of its use." *United States v. Vogler*, 859 F.2d 638, 642 (9th Cir. 1988). In 2001 and 2007, the Ninth Circuit again affirmed that the Property Clause provided the basis for Congress and, by delegation, federal agencies to regulate rights-of-way granted under federal statutes to inholders. *Adams v. United States*, 255 F.3d 787, 795 (9th Cir. 2001) (*Adams II*) (holding that even though landowners possessed the right to access their property, the Forest Service had the authority to impose reasonable regulations that required the landowners to obtain permits for all uses beyond those uses available to the general public); *Hale v. Norton*, 476 F.3d 694, 699-700 (9th Cir. 2007) (holding that the National Park Service had the authority to require an environmental assessment before granting a permit to inholders seeking access to their land).

## 2. Refuge Act

Having explored Congress's Constitutional authority under the Property Clause, we turn to the exercise of this authority via the Refuge Act. The complexity of this case requires us to review four potential theories by which Congress may have the authority to regulate Plaintiffs-Appellees' easement by reservation: (a) Congress's power to "grant easements" under 16 U.S.C. § 668dd(d)(1)(B); (b) Congress's possible preemption of common-law easements via § 668dd(d)(1)(B); (c) the common-law doctrine subjecting easements to reasonable use; or (d) Congress's power under the Property Clause to regulate in a manner analogous to the state police power.

### a. Statutory Language and Legislative History

The Refuge Act authorizes the Secretary of the Interior "under such regulations as he may prescribe, to—"

permit the use of, or grant easements in, over, across, upon, through, or under any areas within the System for purposes such as but not necessarily limited to, powerlines, telephone lines, canals, ditches, pipelines, and roads, including the construction, operation, and maintenance thereof, whenever he determines that such uses are compatible with the purposes for which these areas are established.

16 U.S.C. § 668dd(d)(1)(B). The district court based its opinion on the difference between permitting the use of easements and regulating such use, as well as between granting new easements and regulating existing ones. *Burlison*, 2006 WL 2546564, at *8. The first question in this case is thus whether the language of § 668dd(d)(1)(B) implicitly includes the authority to *regulate* pre-existing easements.

Our interpretive task is difficult because of the ambiguous grammatical structure of § 668dd(d)(1)(B). One reading would be that the subsection authorizes the Secretary of the Interior either to "permit the use of" or to "grant" "easements in over, across, upon, through, or under any areas within the System." This is the reading afforded the statute by the district court and the government in this case. *Burlison*, 2006 WL 2546564, at *8; Defendant-Appellant Br. at 29-30. If this reading were correct, however, one would expect the drafters *not* to have placed a comma after the word "of." For the word "permit" to refer properly to "easements," the subsection should be written as follows: "permit the use of or grant easements in, over, across, upon, through or under any areas within the System . . . ." A second reading would be that the subsection authorizes the Secretary of the Interior to "permit the use of . . . any areas within the System" or to "grant easements in . . . any areas within the System." Were this reading correct, however, one would expect the drafters to have placed a comma after the word "under." For the word "permit" to refer properly to "any areas," the subsection should be written as follows: "permit the use of, or grant easements in, over, across, upon, through, or under, any areas within the System." Thus, the subsection's grammatical structure does not strictly accord with either of two possible interpretations.

Because the text of the Refuge Act is ambiguous, we are permitted to review its legislative history to aid us in determining Congress's intent. *Cline v. Gen. Dynamics Land Sys., Inc.*, 296 F.3d 466, 473 (6th Cir. 2002), *rev'd on other grounds*, 540 U.S. 581 (2004). A 1965 House Report on the Refuge Act refers to the relevant subsection and omits the comma after the word "of."[3] The Report describes the subsection as authorizing the Secretary of the Interior "to permit the use of or grant easements in, over, across, upon, through, or under any areas within the system . . . ." H.R. REP. NO. 1168, at 11 (1965). This statement is consistent with an interpretation of subsection (d)(1)(B) as allowing the Secretary of the Interior to either "permit" or "grant" easements. Another statement in the Report, however, explains that the subsection authorizes the Secretary of the Interior "to permit, in his discretion, other uses of the areas within the national wildlife refuge system for purposes that he finds are compatible with our management of the system. These uses would be permitted either through the issuance of licenses or permits or the granting of easements." H.R. REP. NO. 1168, at 18. This statement is consistent with the second interpretation of the statute because it refers to the Secretary's power "permit . . . uses" of areas within wildlife reserves as well as his power to "grant[]" easements. Thus, the legislative history is inconclusive regarding which of the two interpretations of the subsection at issue most accurately reflects Congress's intent.

We believe that, given the ambiguity of the statutory language and the inconclusive legislative history, the best interpretation of § 668dd(d)(1)(B) is that it authorizes the Secretary to

---

[3] The Report actually refers to section 4, subsection (d)(2) of H.R. 9424, but it is clear from the language of the Report that this subsection ultimately became § 668dd(d)(1)(B). The language of § 4(d)(2) contained in the version of H.R. 9424 published in the Congressional Record is identical with the language of 16 U.S.C. § 668dd(d)(1)(B). 111 CONG. REC. H27188 (daily ed. Oct. 18, 1965).

"permit the use of . . . any areas within the System . . ." as well as to "grant easements in, over, across, upon, through, or under any areas within the System." Reading the statute such that the word "permit" refers to "any areas" yields the interpretation that is most consistent with the structure of § 668dd(d)(1) as a whole. Section 668dd(d)(1)(A) authorizes the Secretary of the Interior to "permit the use of any area within the System for any purpose, including but not limited to hunting, fishing, public recreation and accommodations." Logic suggests that Congress similarly intended § 668dd(d)(1)(B) to refer to the Secretary of the Interior's power to permit the use of areas for a second set of purposes as well as to grant easements for those purposes. The term "grant easement" does not explicitly encompass the power to regulate preexisting easements, but this does not answer the question of whether Congress endowed the Secretary of the Interior with such authority.

The government cites cases in which our sister circuits determined that the federal government has authority to regulate easements and other rights-of-way under the Park Service Organic Act, 16 U.S.C. § 1; the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1784; and the Alaska National Interest Lands Conservation Act of 1980 ("ANILCA"), 16 U.S.C. §§ 3103-3233. In *Vogler*, the Ninth Circuit held that the Park Service Organic Act, which authorizes the Secretary of the Interior "to regulate within a national park to 'conserve the scenery and the nature and historic objects and wildlife therein . . .' applies with equal force to regulating an established right of way within the park." 859 F.2d at 642 (quoting 16 U.S.C. § 1). In *Duncan*, the Eighth Circuit stated that "Congress has given the Forest Service broad power to regulate Forest System land." 50 F.3d at 589 (citing 7 U.S.C. § 1101; 16 U.S.C. § 551). The Eighth Circuit held that the "'special use' regulations" providing that "[b]efore conducting a special use, individuals or entities must submit a proposal to the authorized officer and must obtain a special use authorization," 36 C.F.R. § 251.50(a), give the Forest Service authority "to regulate surface access to outstanding mineral rights." *Duncan*, 50 F.3d at 589. In *Jenks II*, the Tenth Circuit held that regulations established under ANILCA, which mandate that "landowners seeking access to their inholdings must apply for a special use permit from the Forest Service," do not violate landowners' common-law-easement rights. 22 F.3d at 1518.

None of these cases cited by the government are determinative because they all involve statutes that differ in significant respects from the Refuge Act. The Refuge Act does not contain a provision granting broad regulatory authority akin to the sweeping authority granted in 16 U.S.C. § 1. Nor do the federal regulations pertaining to the Refuge Act contain "special use" regulations as broad as those in 36 C.F.R. § 251.50(a).[4] Finally, we are skeptical of the Tenth Circuit's holding in *Jenks II* because it rests on the reasonable-use doctrine, which, as we explain *infra*, is not a sufficient basis for requiring a special-use permit to exercise a right in an easement. Thus, the caselaw cited by the government does not convince us that the power to "grant easements" under the Refuge Act endows the Secretary of the Interior with the authority to regulate Plaintiffs-Appellees' easement.

---

[4] The special-use regulations pertaining to wildlife refuges are narrower than those pertaining to national forests. The special-use regulations issued under the Refuge Act state in pertinent part:

> Public services and temporary structures generally offered by packers, outfitters, and guides for realizing the recreational or other wilderness purposes of a wilderness may be permitted. Temporary installations and structures which existed for these subsistence purposes under valid special use permit or easement when the wilderness was established may be continued if their use is necessary to administer the refuge for the purposes for which it was established and for wilderness purposes. The number, nature, and extent of such temporary structures and services will be controlled through regulations and special use permits issued by the Refuge Manager so as to provide maximum protection of wilderness resources and values.

50 C.F.R. § 35.6(e).

### b. Preemption

At least two of the cases cited by the government and by Plaintiffs-Appellees address the question of whether federal conservation laws preempt state common-law easements. The Refuge Act does not have a comparable provision affirmatively expressing Congress's intent to preempt state law regarding easements. In *Adams v. United States*, 3 F.3d 1254, 1259 (9th Cir. 1993) (*Adams I*), the Ninth Circuit referred to state common law related to easements and held that "Congress has affirmatively spoken in this area through [ANILCA] and [FLPMA]." The Ninth Circuit subsequently held in *Adams II* that pursuant to "FLPMA, 16 U.S.C. § 3210 (a) of ANILCA, and the special use authorization regulations at 36 C.F.R. §§ 251.110, 212.8(b), 251.114(a)-(f), and 251.57 . . . [the inholders'] access rights are subject to reasonable regulation." 255 F.3d at 794-95.

In contrast with ANILCA and FLPMA, § 668dd(d)(1)(B) does not affirmatively speak to the power of Congress to regulate preexisting easements, as explained *supra*. "In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'" *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005). Moreover, the Refuge Act does not contain an explicit preemption provision such as those found in two federal statutes which the Supreme Court has recently determined to preempt state laws. *Riegel v. Medtronic, Inc.*, --- U.S. ---, 128 S. Ct. 999, 1003 (2008); *Rowe v. New Hampshire Motor Transp. Ass'n*, --- U.S. ---, 128 S. Ct. 989, 993 (2008). Therefore, we determine that in the circumstances of this case, the Refuge Act does not preempt Plaintiffs-Appellees' right to an easement acquired by reservation in the Sullivan and Rice Deeds.[5]

Plaintiffs-Appellees cite the Fourth Circuit decision in *United States v. Srnsky*, 271 F.3d 595 (4th Cir. 2001), in support of their argument that the federal government does not have the power to regulate the easement. In *Srnsky*, the Fourth Circuit considered whether FLPMA, ANILCA, or Section 551 of the National Forest Service Organic Act of 1897 ("the Organic Act") preempted landowners' common-law easements. The Fourth Circuit answered this question in the negative. *Srnsky* held that with the possible exception of § 551 "the Organic Act applies only to forests *reserved from public land*" and, therefore, did not apply to the disputed land purchased by the United States from a private party, *id.* at 600; that even assuming that § 551 authorized the Secretary of Agriculture to regulate common-law easements, 16 U.S.C. § 518 precluded this regulation, *id.*

---

[5] *Adams I*, 3 F.3d at 1258-59, held that the following sections of ANILCA and FLPMA preempted state common-law easement rights:

> [T]he Secretary [of Agriculture] shall provide such access to nonfederally owned land within the boundaries of the National Forest System as the Secretary deems adequate to secure to the owner the reasonable use and enjoyment thereof: *Provided*, That such owner comply with rules and regulations applicable to ingress and egress to or from the National Forest System. 16 U.S.C. § 3210(a) [of ANILCA];

> The Secretary [of the Interior] . . . and[] the Secretary of Agriculture . . . are authorized to grant, issue, or renew rights-of-way over, upon, under, or through such lands . . . . 43 U.S.C. § 1761(a) [of FLPMA]; and

> Rights-of-way shall be granted, issued, or renewed pursuant to this subchapter under such regulations or stipulations, consistent with the provisions of this subchapter or any other applicable law, and shall also be subject to such terms and conditions as the Secretary concerned may prescribe regarding extent, duration, survey, location, construction, maintenance, transfer or assignment, and termination. 43 U.S.C. § 1764(c) [of FLPMA].

Certainly, neither ANILCA nor FLPMA explicitly states that either the Secretary of the Interior or the Secretary of Agriculture has the authority to regulate a preexisting easement. One might therefore argue that, under the Ninth Circuit's logic, the Refuge Act is sufficiently clear to preempt common-law easement rights in the same manner that ANILCA and FLPMA did. Plaintiffs-Appellees argue convincingly, however, that the decision in *Adams I* is distinguishable on its facts because the landowners' predecessors in title in that case acquired their rights of access under federal statutes rather than pursuant to common-law easements. In the instant case, Plaintiffs-Appellees' predecessors in title reserved an easement from deeds granting land to the federal government, and that reservation provides the source of Plaintiffs-Appellees' rights of access.

at 601-02; that the provision of the FLPMA authorizing the Secretary of Agriculture "to grant, issue, or renew rights of way" does not extend authority to *regulate* existing common-law easements, *id.* at 601; and that ANILCA does not preempt, but rather operates parallel to, state law because it "applies only to those who lack rights of access under state law," *id.* at 603. The *Srnsky* opinion thus involved statutory interpretation alone. The Fourth Circuit specifically declined to address the Constitutional question whether Congress has the power to enact a statute pursuant to the Property Clause giving federal agencies the authority to regulate common-law easements on federal land. *Id.* at 601 ("We need not decide, however, the extent of Congress' authority to abridge common law property rights, because we find that none of the statutes relied on by the government speaks to the issue.").

Plaintiffs-Appellees cite *Srnsky* for the argument that because the easement at issue in this case predated the federal government's acquisition of the servient tenement (the Rice and Sullivan tracts) the easement is, therefore, not "within the System" subject to regulation under 16 U.S.C. § 668dd(d)(1)(A)-(B). In discussing why ANILCA did not preempt common-law easements, *Srnsky* distinguished the *Jenks I* and *Adams I* decisions. The Fourth Circuit held that in *Srnsky*, unlike in the *Jenks* and *Adams* litigation, the "predecessors in interest," of the landowners claiming an easement, "did not take pursuant to a federal statute; rather they deeded part of *their* land to the federal government." *Srnsky*, 271 F.3d at 604. Plaintiffs-Appellees attempt to extrapolate from this statement to assert a general principle that when landowners deed land to the federal government, the government as the owner of the servient estate has no authority later to regulate common-law easements over the estate. This argument, however, ignores that the Fourth Circuit in *Srnsky* was interpreting particular statutes not at issue in the present case. The distinction made in *Srnsky* between that case and *Adams* and *Jenks* must be read in light of the Fourth Circuit's holding that ANILCA does not preempt state law because it applied only to persons lacking rights-of-way under state law. *Srnsky*, 271 F.3d at 603. Accordingly, the Fourth Circuit found that because the landowners in *Srnsky* did not gain title pursuant to federal law, as the landowners in the *Adams* and *Jenks* suits did, but rather acquired easements under state law, ANILCA did not apply to them. *Id.* at 604. Thus, the distinction drawn in *Srnsky*, which Plaintiffs-Appellees believe critical, would have import for the current case only if the Refuge Act, too, applied solely to landowners possessing rights-of-way pursuant to federal law. The Refuge Act, however, contains no provision similarly granting rights only to those lacking access rights under state law. Ultimately, the *Srnsky* decision stands only for the proposition that where the Organic Act, FLPMA, and ANILCA do *not* preempt state common-law easements, those statutes do not authorize the regulation of private easements held prior to the government's acquisition of land. Because the instant case does not involve the same statutes, *Srnsky* cannot end our inquiry.

### c. Reasonable Use Doctrine

The Government argues in this case that the Refuge Act should be read in light of the general principle that the holder of a servient tenement may subject the use of an easement over its property, by the holder of the dominant tenement, to a reasonableness standard. Appellant Br. at 30 (citing *Southern Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 746 (10th Cir. 2005)). In *Jenks II*, the Tenth Circuit held that under the "reasonable use" doctrine, the federal government as the holder of the servient estate may require permits to traverse federal land, even where an inholder may have a common-law easement upon the land. *Jenks II*, 22 F.3d at 1518. By contrast, the Eighth Circuit holds that while the "reasonable use" doctrine is applicable to the federal government as the holder of a servient estate, the doctrine does not extend so far as to "cloak the Forest Service with the specific authority to approve surface use plans." *Duncan*, 50 F.3d at 588. We agree with the Eighth Circuit that while the government as the holder of the servient estate may require that Plaintiffs-Appellees make only reasonable use of their easement over the field-access road, this doctrine alone would not allow the government to require Plaintiffs-Appellees to obtain a permit to exercise their rights in the easement.

### d. Police power

We have determined that the power to "grant easements" under § 668dd(d)(1)(B) does not extend to the regulation of preexisting easements, that this power to grant easements does not preempt state common-law rights, and that the reasonable-use doctrine does not justify regulation of Plaintiffs-Appellees' easement. We do conclude, however, that the Fish and Wildlife Service may legitimately exercise the sovereign police power of the federal government in regulating the easement. Section 668dd(d)(1)(B) delegates the power to the Secretary of the Interior (and the Fish and Wildlife Service) "under such regulations as he may prescribe," to "permit the use of . . . any areas within the System for purposes such as . . . roads." The question before us is whether the permissive power respecting roads authorized by the Refuge Act also includes the power to regulate a private easement over a road. We answer this question in the affirmative.

Plaintiffs-Appellees argue that their easement over the field-access road is not "within the System" as contemplated by the Refuge Act because the Rice and Sullivan Deeds, which granted the land at issue to the federal government, reserved the easement. This argument, however, confuses a private property right in an easement with a possessory estate in land. "To distinguish [easements] from estates in land, they do not give the holder a right of possession but a right to use or to take something from land, the possessory estates in which are owned by others." WILLIAM B. STOEBUCK AND DALE A. WHITMAN, THE LAW OF PROPERTY § 8.1 at 435; *see also* RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 8.1. In this case, the government has a possessory estate in the portions of the field-access road that traverse the Sullivan and Rice tracts, which now form part of the Lower Hatchie National Wildlife Refuge. Plaintiffs-Appellees possess an easement affording them the right to use the field-access road, even though it passes through federal land that is otherwise closed to the public during certain times of the year. Thus, the fact that the Rice and Sullivan Deeds reserved the easement in question does not mean that, in a territorial sense, the field-access road does not lie "within the System." Nor does the reservation mean, in a conceptual sense, that Plaintiffs-Appellees' right to use the road is not subject to the Fish and Wildlife Service's authority to regulate the use of roads "within the System."

Indeed, inherent in the Secretary of the Interior's power "under such regulations as he may prescribe" to "permit the use of . . . any areas within the System for . . . roads," is his power to regulate a preexisting easement in a road. In *Kleppe*, the Supreme Court reaffirmed a long-existing comparison between the federal government's powers under the Property Clause and the state's inherent police powers: "[T]he general government doubtless has a power over its own property analogous to the police power of the several states, and the extent to which it may go in the exercise of such power is measured by the exigencies of the particular case." 426 U.S. at 540 (quoting *Camfield*, 167 U.S. at 525.) Thus, if the regulation of the easement would be a valid exercise of the state police power, then it must also be a legitimate exercise of the Secretary of the Interior's authority to permit the use of a road within the scope of regulations enacted pursuant to the Refuge Act.

Under Tennessee law, the owner of an easement is subject to the police power, though not to the extent that unreasonable regulation amounts to taking without due process. Mahlon L. Townsend, "Easements in Tennessee," 24 TENN. L. REV. 219, 220 (1956). The Tennessee Court of Appeals has held that utility companies which possess easements giving them the right to occupy public streets hold those property rights subject to the reasonable exercise of local police powers. *Southern Bell Tel. & Tel. Co. v. City of Nashville*, 243 S.W.2d 617 (Tenn. Ct. App. 1951). The Tennessee courts have also upheld state laws establishing zoning, inspection, and permit schemes intended to promote wildlife and other forms of environmental conservation. *See, e.g.*, *State v. Hall*, 51 S.W.2d 851, 852-53 (Tenn. 1932) (upholding as a valid exercise of the police power a statute that requires "every person participating in the privileges of taking or possessing wild animals, wild birds, wild fowl and fish . . . to permit the State Game Warden or his deputy game wardens to

inspect and count such wild animals"); *McDaniel v. McCall*, 655 S.W.2d 155, 157-58 (Tenn. Ct. App. 1983) (declining to enforce a contract that if enforced would have violated a statute, enacted pursuant to state police powers, requiring surface mining operators to obtain a permit to engage in certain mining activities).

In *Riggs v. Burson*, 941 S.W.2d 44 (Tenn. 1997), the Tennessee Supreme Court upheld a Tennessee statute enacted in 1992 that prohibited the operation of helicopter tours within nine miles of a national park, in an action brought by plaintiffs who owned and operated a heliport located within nine miles of the Great Smoky Mountains National Park targeted by the statute. The court held that the statute was not preempted by federal law; that the statute reasonably related to legitimate interests in public safety, comfort, and welfare, in furtherance of which the state could legislate pursuant to its police powers; that the statute did not deprive plaintiffs of equal protection of the law; and that the statute did not represent a suspension of laws in violation of the Tennessee Constitution. *Id.* at 50, 52, 53-54. *Riggs* thus stands for the proposition that under Tennessee law, the state police power may in some cases be exercised so as to deprive an individual of a preexisting property right. We do not need to decide in the current case whether under federal law Congress's powers under the Property Clause extend to the deprivation of a preexisting property right. In the circumstances of the instant case, the federal government does not argue that it should be allowed to eviscerate Plaintiffs-Appellees' property rights in an easement over the field-access road but only that the Secretary of the Interior has the right to enforce reasonable regulations on the use of the easement. Such regulation would be legitimate under the state police power, and the federal government possesses an analogous power. We therefore hold that the power of the Secretary of the Interior pursuant to 16 U.S.C. § 668dd(d)(1)(B) "under such regulations as he may prescribe, to . . . permit the use of . . . any areas within the System for . . . roads," authorizes the Secretary reasonably to regulate Plaintiffs-Appellees' easement over the field-access road.

## III. CONCLUSION

For the reasons stated above, we conclude that the Rice and Sullivan Deeds expressly reserved an easement, which now gives Plaintiffs-Appellees the common-law right to traverse the field-access road. We also hold that under the powers authorized by the Refuge Act, enacted pursuant to the Property Clause, the Secretary of the Interior via the Fish and Wildlife Service may impose reasonable regulations on the use of Plaintiffs-Appellees' common-law easement. We therefore **AFFIRM** in part and **REVERSE** in part the judgment of the district court. We note that remand is not appropriate at this time because Plaintiffs-Appellees have refused to apply for the Special Use Permit required by the Fish and Wildlife Service. For this same reason, we express no opinion on the reasonableness of any current or future restriction or regulation on Plaintiffs-Appellees' use of the easement, as that question is not properly before us at this time, but is instead a question to be decided on the basis of the permit. Once Plaintiffs-Appellees apply for this permit, in the case that it is denied or in the case that Plaintiffs-Appellees find the restrictions set forth under the permit to be unreasonable, they can bring suit in federal district court to challenge the reasonableness of the regulations imposed by the Fish and Wildlife Service.